Chyanne **DABNEY**, Defendant
Below, Appellant,

v.

**STATE** of Delaware, Plaintiff
Below, Appellee.

No. 120, 2007.

Supreme Court of Delaware.

Submitted: Nov. 28, 2007.
Decided: March 10, 2008.
Revised: May 23, 2008.

Nicole M. Walker (argued) and Gerald M. Spadaccini, Office of the Public Defender, Wilmington, Delaware for appellant.

James T. Wakley, Department of Justice, Wilmington, Delaware for appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

STEELE, Chief Justice.

Appellant-defendant Chyanne Dabney appeals his Superior Court conviction of Rape Second Degree.[1] At all times between his arrest and conviction, Dabney remained incarcerated solely because he did not have the resources to post bail. Dabney contends that delays in scheduling his trial on the single count of Rape Second Degree violated his right to a speedy trial, guaranteed by the Sixth Amendment to the United States Constitution and Arti-

---

1. 11 *Del. C.* § 772 (2006).

cle I, Section 7 of the Delaware Constitution. He contends that the State unnecessarily delayed his trial for seven months, despite a court order designed to prevent the delay, by failing to provide timely and complete court ordered DNA discovery and analysis. After review, we hold that the State impermissibly violated Dabney's right to a speedy trial. Therefore, we reverse his conviction for Rape Second Degree and remand to Superior Court for resentencing on the unchallenged companion convictions.

### FACTS AND PROCEDURAL HISTORY

In November 2005, Dabney's girlfriend, Maribel Pagan, found a black bag in Dabney's closet containing a vibrator and three Polaroid pictures of Dabney's 12 year old daughter, Meghan,[2] posing naked with the vibrator. Pagan ran home and called the police, who executed a search warrant at Dabney's home. The police found the vibrator in a plastic bag in the closet, as well as a Polaroid camera, a green towel, and female clothing visible in the photos. DNA tests revealed both Dabney's and Meghan's DNA on the base of the vibrator. Dabney later wrote to Pagan and admitted that he had taken the photos of Meghan.

Police arrested Dabney on November 21, 2005. The Justice of the Peace set secured bail at $95,000 with conditions for release. Dabney was immediately incarcerated in default of bail. According to the docket, his preliminary hearing was held on November 30, 2005. He was bound over for trial. Defense counsel made a general discovery request on December 12, 2005. A grand jury indicted Dabney on January 9, 2006 on nine counts—three counts of Sexual Solicitation of a Child,

three counts of Possession of Child Pornography, and three counts of Rape Second Degree. At arraignment on January 17, 2006, the judge increased the amount of secured bail to $145,000.

On February 9, 2006, Superior Court's first scheduling order set the trial date for April 6, 2006, *five months* after Dabney's arrest and incarceration in default of bail. On February 24, 2006, a second Superior Court scheduling order rescheduled the trial date to June 13, 2006, *seven months* after Dabney's arrest. The record does not reflect why the Superior Court rescheduled the trial. Dabney's brief suggests that the rescheduling resulted from the State's unilateral decision to reindict Dabney. While this may be correct, the grand jury did not reindict Dabney until March 20, 2006, four months after his arrest and one month *after* Superior Court's second trial scheduling Order. The reindictment added three counts of Sexual Exploitation of a Child to the original nine counts. At Dabney's second arraignment on April 11, 2006, a Superior Court judge reduced secured bail to $120,000 and again set conditions for release. Dabney defaulted and remained incarcerated solely for trial on these charges.

The State intended to prosecute Dabney for Rape Second Degree since at least January 9, 2006, and it wanted the DNA analysis relating to those three counts. The State did not, however, deliver DNA evidence to a lab for testing until March 1, 2006, almost four months after arresting Dabney. The March 20, 2006 reindictment did nothing to alter that fact. Yet over *four months* later (by which time Dabney had been in prison six months awaiting trial on one or more of the charges), less

---

**2.** A pseudonym has been substituted for the victim's name pursuant to Supreme Court

Rule 7(d).

than one month before the trial date on May 17, 2006, the State requested a continuance based in part on "the fact that the DNA analysis is incomplete." The Superior Court noted this precise basis in a May 19, 2006 order in which it continued the trial date to July 13, 2006 (a date *eight months* after Dabney's arrest and incarceration). A second reason the State proffered for the continuance was that the then-assigned prosecutor had a scheduling conflict occasioned by another trial. The *form requesting the continuance reflects the defense's opposition to the continuance.* The Superior Court's order appeared to continue the trial, yet also left Dabney's trial date in place in case the prosecutor received the DNA analysis in a timely fashion and the scheduling conflict was resolved.

The Superior Court's May 19th order clearly set forth conditions for moving the case along. First, before the DNA information would be admissible in the State's case against Dabney, the defense would have to have received the expert's report and the information required by 11 *Del. C.* § 3515[3] by June 13, 2006. Second, Dabney's new trial on July 13, 2006—an extension of one month after the *second* trial date of June 13, 2006—was "firm and will not be continued." As matters turned out, June 13, 2006, the second trial date, became nothing more than a discovery deadline. The Superior Court recognized the inherent prejudice that continued delay would cause the incarcerated Dabney. After noting that Dabney remained in custody six months after his arrest, the Superior Court wrote that continuing the trial beyond the third trial date of July 13, 2006

"would be inappropriate and unreasonable unless the State is willing to agree that [he] be released from [his] custody status." The Superior Court went on to advise the prosecutor (Josette Manning) that if she could not try the matter personally, she needed "to have [it] reassigned to another deputy to handle."

On June 2, 2006, before the discovery response deadline (or the nominal second trial date) of June 13, 2006 set in the order, the State furnished defense counsel with a DNA report, but without the statistical analysis facially contemplated by 11 *Del. C.* § 3515. The report simply noted that "no statistical analysis was calculated due to the relatedness between Chyanne Dabney and [Meghan] (Father/Daughter)." On June 12, 2006, defense counsel sent the prosecutor an additional four page detailed discovery request, which included a specific request for the statistical analysis not included in the original report. On July 5, 2006, defense counsel received a response to the June 12 request with some supplemental discovery, but no statistical analysis. The State's very terse cover letter did not explain why the response remained incomplete.[4]

On the day before trial, July 12, 2006, defense counsel filed a motion *in limine* to exclude the DNA evidence, citing specifically the Court's May 19, 2006 order and including supporting documentation. The motion also pointed to this Court's decision in *Nelson v. State,* in which we held that: "DNA evidence is inadmissible in the absence of a statistical interpretation of a declared match. Accordingly, admission of only one of these components without the

---

3. 11 *Del C.* § 3515 (2006) (addressing the admissibility of DNA profiles in criminal proceedings).

4. The body of the letter read: "In response to your DNA Discovery request letter dated June 12, 2006, enclosed please find your copy of the DNA packet including two CDs, as prepared by the Office of the Medical Examiner. Should you need anything further, please feel free to contact me at . . . ."

other renders *all* of the DNA evidence inadmissible."[5] As defense counsel noted to a different Superior Court judge the next day,[6] the defense *could have* raised the objection at trial, but by raising the objection before the trial, the trial judge could still address the issue before impaneling a jury.

Nearly two months earlier, the initial Superior Court judge had entered an order for a "firm" trial date and instructed the prosecutor to get a replacement if she could not try it herself. Nevertheless, a new prosecutor (Donald Roberts), who "got it yesterday afternoon," received the assignment the day before the trial date that the State knew the scheduling judge intended would be "firm." The new prosecutor entered his appearance on July 13, 2006, the first day of the scheduled trial.

After acknowledging that his tardy assignment left him unprepared, Roberts opposed the defense motion *in limine* on the grounds of surprise arguing that the State had not received the motion until 5:15 p.m. the day before trial, and that *he* had not had time to do any research before responding. Defense counsel responded that he had discussed the matter earlier with the original prosecutor, Josette Manning. Manning, however, was not present to respond to the ongoing discovery issues and Roberts added nothing on the record that would have resolved whether he did or did not know about earlier conversations between defense counsel and Manning.

The State represented that it would be unable to proceed to trial on the Rape Second Degree charges (as opposed to the remaining charges) without the DNA evidence. Roberts indicated that he did not expect much, if any, testimony from the victim and demanded a *Daubert* hearing focused on the scientific necessity of completing the absent statistical analysis.[7] The Superior Court (through the second judge who actually presided at trial) continued the "firm" trial date on *all* charges, including those for which the DNA evidence was wholly irrelevant, and deferred to the first Superior Court judge to schedule the *Daubert* hearing.[8]

Six days later, on July 19, 2006, the Superior Court ordered the State to file a written response to the motion *in limine*. On July 26, 2006, the State responded to the motion and included the requested statistical analysis. On July 28, 2006, the judge asked defense counsel to review the response and whether he continued to object to the admission of the DNA evidence. The judge indicated that he was not inclined to grant the motion *in limine* because the State had produced the requested discovery and the trial had already been continued. Defense counsel conceded that the State had provided the statistical analysis, but maintained its objection to the admission of the DNA evidence, because the State failed to comply with that very judge's May 19th order instructing the State to produce the requested test results by June 13, 2006—an instruction clearly intended to preserve the July 13, 2006 trial date.

The judge denied the motion *in limine* on October 19, 2006. He was "not willing

---

**5.** 628 A.2d 69, 75 (1993).

**6.** The second Superior Court judge was the judge who ultimately presided over the trial. In this Opinion, we do not distinguish between the second Superior Court judge (who presided) and the first Superior Court judge (who handled all but one of the relevant pre-

trial motions). We refer to both without distinction, as "the Superior Court judge."

**7.** *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

**8.** *See supra* note 5.

to find the State had *intentionally* violated its discovery order justifying exclusion of the DNA testing." (emphasis supplied) The Superior Court never conducted the *Daubert* hearing the State demanded and for which the "firm" trial date had been continued. Rather than press its demand for a *Daubert* hearing, after that request had achieved the desired continuance of the July 13, 2006 trial date, the State abandoned its "good faith" dispute having already (July 26, 2006) produced the allegedly irrelevant statistical analysis within seven days of being ordered to produce it. After July 26, 2006, no "good faith scientific dispute" existed.[9]

On November 28, 2006, 372 days after his arrest *and incarceration*, Dabney finally had an opportunity to respond to the charges on which he had been arrested on November 21, 2005. The parties selected a jury on November 28 and the trial lasted only two days—November 29–30. Before jury selection began, the prosecutor, again Manning, indicated that Meghan was probably not going to testify. Without Meghan's testimony, Manning said, the State would not be able to proceed on two of the three Rape Second Degree counts, since the State could not otherwise prove that each of the three pictures constituted a separate penetration. On November 29, during the trial, the State *nolle prossed* two Rape Second Degree counts "on the basis of the evidence in the record at this point." Meghan did not testify.

For the first time, on November 28, 2006, the day trial began, Carmen Dabney, Meghan's biological mother and Dabney's ex-wife, suddenly asserted that her former husband had confessed the crimes to her while she was visiting him in jail. Carmen testified that Dabney had told her that he had taken the pictures, but she (Carmen) could not unequivocally state whether or not Dabney told her that he had put the vibrator in Meghan's vagina. At trial, Dabney only contested the one count of Rape Second Degree that the State had not *nolle prossed*. The defense disputed that count's required element of sexual penetration. A jury found Dabney guilty on all counts.

On February 16, 2007, the trial judge sentenced Dabney to 16 years in prison followed by probation.

## DISCUSSION

Most speedy trial violations result in dismissal of an indictment. Dabney, however, claims only that the delays in prosecuting the Rape Second Degree charges prejudiced him and claims no prejudice from the delayed prosecution of the balance of the charges. Counsel confirmed this remarkable position at oral argument on appeal.

▮ We review claims alleging an infringement of a constitutionally protected right *de novo*.[10] In *Barker v. Wingo*,[11] the United States Supreme Court created a four factor balancing test to determine whether a defendant had been denied his Sixth Amendment right to a speedy trial: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion

---

9. The "dispute" over whether the statistical analysis was indeed required under 11 *Del. C.* § 3515 or *Nelson* or whether it was scientifically unnecessary was never resolved.

10. *Keyser v. State*, 893 A.2d 956, 961 (Del. 2006).

11. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). This Court adopted the *Barker* analysis in *Johnson v. State*, 305 A.2d 622, 623 (Del.1973).

of his right to a speedy trial; and (4) the prejudice resulting to the defendant from the delay.[12]

## I.  *The Defense's Contentions*

Dabney argues that the State denied his right to a speedy trial because the State knew it would be seeking to admit DNA testing evidence from January 9, 2006, did not request a DNA lab test until March 1, 2006, yet sought and received continuances from April 6, 2006 to July 13, 2006, to complete its DNA analysis. Although the Superior Court granted the requested continuances, it also ordered production of the analysis by June 13, 2006 with the caveat that if that deadline were not met, the DNA test results would not be admitted. The State did not provide the DNA statistical analysis by June 13, 2006, as 11 *Del. C.* § 3515 and the Superior Court's order required. The defense, relying on the Superior Court Order's own wording, pressed the issue by seeking to bar the partial DNA analysis as evidence at trial. The State, however, through a prosecutor claiming unfamiliarity with the case, (i) secured another continuance, under color of a need to prepare for a *Daubert* hearing challenging the quality of its own evidence; and, (ii) furnished Dabney the disputed statistical analysis during the delay this continuance had produced. Dabney contends that because it was possible for the State to prepare a statistical analysis, the State unnecessarily—if not intentionally—delayed his trial by seven months, thereby violating his constitutional right to a speedy trial.

## II.  *The State's Contentions*

The State responds that its actions did not deny Dabney's right to a speedy trial because the lapse of more than one year between Dabney's arrest and his trial was not unreasonable. The State claims the delay resulting from a failure to provide statistical analysis occurred because of a good faith "scientific belief" that it was not necessary. The State further contends that Dabney did not assert his right to a speedy trial and that the delay neither impaired his trial preparation nor prejudiced him. The State does not address its accountability either for the delay resulting from a prosecutor who was unfamiliar with the issues appearing for the State for the first time on the third, so called "firm," scheduled trial date or for the four months that elapsed before the recognized "need" for DNA analysis and actual delivery of a sample to the lab for testing. Thus, the State argues that an analysis of the four factors, taken together with appropriate weight to each as applied to the facts here, compels the conclusion that the elapse of 372 days between arrest (and incarceration) and trial on a single contested charge of Rape Second Degree did not violate Dabney's right to a speedy trial.

## III.  *Length of Delay*

The length of the delay is the trigger that necessitates the consideration of the other three *Barker* factors. "[U]ntil there is some delay which is presumptively prejudicial, there is no necessity for inquiring into the other factors that go into the balance."[13] As we held in *Middlebrook v. State*, "[t]he right to a speedy trial at-

12.  *Barker*, 407 U.S. at 530–31, 92 S.Ct. 2182; *Page v. State*, 934 A.2d 891, 896 (2007); *Miles v. State*, 2006 Del. LEXIS 184, 2006 WL 1027202 at *2 (Del.Supr.); *Middlebrook v. State*, 802 A.2d 268, 273 (Del.2002); *Skinner v. State*, 575 A.2d 1108, 1115 (Del.1990);

*Johnson v. State*, 305 A.2d 622, 623 (Del. 1973).

13.  *Hughey v. State*, 522 A.2d 335, 341 (Del. 1987) (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. 2182).

taches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first." [14] No specific length of delay automatically violates the right to a speedy trial; rather the length is "dependent on the peculiar circumstances of the case." [15]

Had Dabney gone to trial on April 6 as first scheduled, 127 days would already have been between Dabney's arrest and his *incarceration* in default of bail. Had he been tried on June 13, 2006, the second trial date, the elapsed time would have been 204 days, almost seven months after his incarceration in default of bail. With the continuance to July 13, 2006, 234 days elapsed between Dabney's arrest and incarceration, and his potential trial. Although it is not codified in Delaware law, the Superior Court speedy trial guidelines set the standard that 90% of criminal trials should be held, or the cases otherwise disposed of, within 120 days of indictment, 98% within 180 days, and *all* cases within one year.[16] Thus, if Dabney had gone to trial on his "firm" trial date of July 13, 2006, the delay in his trial would have already been beyond the standard for 98% of cases. By the time Dabney went to trial on November 28, 2006, the delay was well beyond the standard that required the disposition of all cases within one year.

The Superior Court's guidelines do recognize that "the courts are not responsible for moving cases through the criminal justice system between the time of arrest and indictment/information." [17] Nevertheless, when considering the length of delay for a defendant who is incarcerated for the entire period between arrest and trial, we must look beyond the guidelines and consider also the time elapsed between arrest and indictment. During that period, the State is responsible for moving cases through the criminal justice system. Because the trial delay in this case exceeded one year between arrest and incarceration to trial, we are compelled to find that the length of delay necessitates our consideration of the other *Barker* factors.

## IV. *Reason for the Delay*

The second *Barker* factor that we must consider is the reason for the delay.[18] The State admits in its brief that, "the majority, if not all, of the lapse of time between Dabney's arrest and his trial is attributable to the State in the sense that the State was responsible for the DNA analysis performed by the Medical Examiner." But, the State insists, that the statistical analysis was not done in a timely fashion "because of a good faith scientific belief that the statistical analysis was not necessary." We disagree with the State's reliance on its asserted "good faith belief" and

14. *Middlebrook*, 802 A.2d at 273. The U.S. Supreme Court has held that the length of time between arrest and trial may create a rebuttable presumption of prejudice for this factor. *Doggett v. U.S.*, 505 U.S. 647, 658, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992) (finding an eight and half year delay to create a presumption of prejudice). Similarly, this Court has found a four year delay to be presumptively prejudicial. *See Middlebrook*, 802 A.2d at 277.

15. *Barker*, 407 U.S. at 530–31, 92 S.Ct. 2182; see also *Skinner v. State*, 575 A.2d 1108, 1115 (Del.1990).

16. Supreme Court of Delaware Administrative Directive 130 (July 11, 2001): "At least 90% of all criminal cases shall be adjudicated as to guilt or innocence or otherwise disposed of within 120 days from the date of indictment/information, 98% within 180 days, and 100% within one year." Exceptions apply to this guideline, but none apply to Dabney.

17. *Id.*

18. *Barker*, 407 U.S. at 530–31, 92 S.Ct. 2182.

find that this factor weighs heavily against the State.

By contending that DNA was always critical to its case, the State appears to suggest that delays attributable to DNA issues are an almost automatic basis for continuing trial at the State's convenience. To us, it is significant that no clinical or administrative problems caused the "delay." The State knew that Dabney had defaulted bail in part on charges for which the State initially believed it needed DNA evidence. Yet, the State never requested any DNA lab testing until four months after Dabney was incarcerated. The State's unilateral determination that it was not required to perform a statistical analysis caused a delay that was exacerbated by a last minute substitution of prosecutors. That combination of events resulted in a prosecutor, who was unfamiliar with the issues in the case, demanding a further continuance on spurious grounds on the first day of a "firm trial date that will not be continued."

From the time of Dabney's arrest, the State had seven months to prepare for the June 13, 2006 trial. The State does not explain why it waited almost four months to deliver DNA evidence to the lab for testing. Having obtained a continuance on May 19, 2006 to July 13, 2006, the State bore the responsibility of having the trial assigned to a prosecutor who was prepared to proceed with the case on that date.

On July 13, 2006, the new "prosecutor of the day," Roberts, told the Superior Court that the defense motion *in limine* "surprised" the State. Because the original prosecutor was not there to either confirm or deny that defense counsel had indeed spoken to her about DNA issues well before trial, it was unfair for the court to take at face value the representation that the defense motion "surprised" the State. Whether the DNA analysis was complete

or complied with the statute had been in issue as early as May 19, 2006, when the Superior Court ordered a discovery response compliant with 11 *Del. C.* § 3515. The DNA statistical analysis dispute (if indeed genuine) may have been a surprise to Roberts, but it could hardly have been a surprise to "the State." Had the State focused on its obligations under the May 19, 2006 order, it could have raised its argument—that compliance with 11 *Del. C.* § 3515 was unnecessary given the type of DNA testing involved and the "relatedness of the defendant and victim"—at least as early as May 19, 2006.

Roberts' claimed lack of personal knowledge notwithstanding, the State had been on notice that the defense wanted the statistical analysis called for by the statute. The State had no fair basis to conclude that it need not comply with 11 *Del. C.* § 3515 or that the matter would simply disappear because the State had unilaterally determined the statistical analysis had no relevance. The State had a month to respond and attempt to resolve the discovery dispute before the trial. The State knew that admitting the DNA results and related testimony without pretrial production of the statistical analysis, would be at issue at trial. Even a casual reading of the May 19, 2006 order would have made that conclusion inescapable. No matter what excuse the State intended to offer for not providing the statistical analysis, the prosecutor assigned to try the case on the July 13, 2006 "firm" trial date was obligated to be prepared to deal with the remaining DNA issues so that the trial could go forward.

Instead of observing that duty, Roberts argued that "[t]he reason this is a big deal to the State is if the defense were allowed to exclude every sample of mixed DNA, that's dramatically going to impact upon our ability to prosecute other sex offenses

or any other offense where we have a mixed sample." The transcript of the proceeding reveals that Roberts made no coherent scientifically based argument why the statistical analysis was unnecessary, never argued that it was not required under 11 *Del. C.* § 3515, and did nothing but "drop back and punt" by asserting that briefing and a *Daubert* hearing were needed. If indeed the State had a "good faith scientific belief" that the statistical analysis was unnecessary, that explanation should have been communicated to the court in timely fashion so that the dispute could have been resolved before the court-ordered "firm" trial date. At the very least, the prosecutor who appeared for trial on July 13, 2006 should have been fully prepared to explain in substantive terms why the court-ordered statistical analysis had not been provided.

The State's July 27, 2006 response to the motion *in limine* asserts reasons that Roberts himself failed to advance on the trial date. Even so, the statistical analysis requested since May 19, 2006, actually accompanied the State's response. We must therefore assume the State could have either (i) complied with 11 *Del. C.* § 3515 as early as thirty (30) days after the initial discovery filed on December 15, 2005; or, (ii) objected to the production of the analysis, thereby framing the issue early on. In an attempt to avoid the sanction decreed by the Superior Court in its May 19, 2006 order, the State asserted, in a footnote in its written response, the palpably disingenuous argument that "the defense should have filed a Motion to Compel rather than engage in 'sandbagging' mere hours before trial. Therefore the defense shares responsibility for any delay." The Superior Court's decision on the motion includes a finding that, by filing the motion *in limine* on the eve of trial, the defense contributed to the delay. We disagree. A careful scrutiny of the timeline and record of the case shows that characterization to be inaccurate and unfair.

Here, inconveniently for the State's argument, the only charges to which the DNA evidence was arguably relevant were three counts of Rape Second Degree, two of which the State *nolle prossed* during the trial because the victim would not testify. At oral argument on appeal, the State admitted that even the Rape Second Degree counts did not depend *solely* on DNA analysis because the perpetrator's identity was never at issue. The State had a December 4, 2005 letter from Dabney sent to Maribel Pagan, confessing to the crimes and the incriminating pictures. The Rape Second Degree charges were the only counts of the indictment Dabney contested (because he denied penetration, an essential element) and arguably the only reason for a trial at all.

The record also discloses that the actual DNA evidence produced at trial did not conclusively establish that Dabney penetrated Meghan's vagina with the vibrator—an element required for conviction. It therefore appears that the DNA evidence was never *necessary* for the prosecution—yet the State's demand that it be available nevertheless resulted in a convoluted, almost Gilbert and Sullivan—like charade, that resulted in unacceptable trial delay. A jury found Dabney guilty of only one count—Rape Second Degree—to which DNA analysis was even arguably relevant. We find that the State clearly responsible for this *unnecessary* and lengthy delay.

## V. *Assertion of Speedy Trial Right*

The third *Barker* factor we must consider is whether the defendant has timely and vigorously asserted his right to a speedy trial.[19] Dabney's arguments are not aided

19. *Barker*, 407 U.S. at 530–31, 92 S.Ct. 2182.

by the fact that his trial counsel did not specifically demand a speedy trial under the United States or Delaware Constitutions or even remind the State or court of the speedy trial guidelines. Defense counsel did, however, object to further continuance of the trial after the initial seven months from arrest to the scheduled trial date. The Superior Court *sua sponte*, put the State on notice that it recognized the prejudice caused by the delay and that a further continuance would be "inappropriate and unreasonable" without releasing Dabney from custody. Once an objection is made and the trial judges are thereby focused on the issue, repeated incantations demanding a trial are not required or even contemplated by our State's speedy trial guidelines or by the federal and Delaware constitutions. No facts of record suggest that after the first seven months Dabney ever acquiesced in any delay. Therefore, we find that Dabney did preserve his speedy trial argument before the Superior Court.[20] Even if the specific words "Dabney's right to a speedy trial" were not used, all parties and the court were and should have been keenly aware of the speedy trial issue, and mindful that Dabney remained incarcerated on *all* charges while the parties contested the issues relating to DNA, the Rape Second Degree charges, and the reassignment of prosecutors. Although this one factor disfavors Dabney slightly, it does not outweigh the remaining factors, all of which weigh heavily in Dabney's favor.

## VI. *Prejudice to Defendant*

The fourth *Barker* factor considers the prejudice to the defendant as a result of the delay.[21] We disagree with the State's contention that the delays did not prejudice Dabney, and conclude that prejudice must be accorded significant weight in our analysis. We analyze this prong "in light of three of defendants' interests that the speedy trial right was designed to protect: (1) preventing oppressive *pretrial incarceration;* (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired."[22]

The speedy guidelines are especially important where, as here, the defendant is incarcerated. Being incarcerated is inherently prejudicial. Therefore, Dabney has established that he suffered prejudice from the lengthy delay without needing to address his specific arguments about the impairment of his defense. As we wrote in *Middlebrook:*

> First, lengthy pretrial incarceration "has a destructive effect on human character and makes the rehabilitation of the individual offender much more difficult." In addition, time spent in jail awaiting trial by one presumed innocent until proven guilty often means loss of a job, disrupts family life, and enforces idleness. "Imposing these consequences on anyone who has not yet been convicted is serious." Second, "even if an accused is not incarcerated prior to trial, he is still disadvantaged ... by living under a cloud of anxiety."[23]

Furthermore, Dabney had bail set, but defaulted immediately. The record does not show that the trial judge or parties

---

**20.** *See Keyser v. State,* 893 A.2d 956, 959 (Del.2006).

**21.** *Barker,* 407 U.S. at 530–31, 92 S.Ct. 2182.

**22.** *Middlebrook v. State,* 802 A.2d 268, 276 (2002) (emphasis supplied).

**23.** *Id.* at 276–77 (internal quotations from *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

explored any conditions sufficient to allow him to be released from custody at the time of *any* continuance. There appears to have been no effort to sever the one contested count and go to trial on the six charges which Dabney did not contest. Dabney remained incarcerated because of his particular financial circumstances. Bail was initially set when Dabney was brought before the Justice of the Peace, bail increased after the indictment, and bail was later reduced after reindictment. Here the fundamental prejudice lies in the fact that Dabney remained incarcerated without trial in default of bail for over a year before trial. Where the defendant is incarcerated, intuitively it is more difficult for him to prepare for trial, to meet with counsel, and to participate in gathering evidence in his defense.

Dabney has argued specifically how his defense was impaired, including the fact that the victim was not willing to testify on July 13th (and never did) and that Carmen Dabney suddenly asserted—only on November 28, 2006, the day of trial—that her ex-husband had confessed the crimes to her. We do not need to rely on those arguments however. Although the State claims that it could not go to trial without the DNA evidence on July 13th, a jury may well have found Dabney guilty had the State presented the other available (non-DNA related) evidence or simply have proceeded on the charges for which no DNA evidence was necessary. The State's *preference* to have DNA analysis available when it may have been unnecessary for all but one of the pending charges, did not outweigh the prejudice to a defendant imprisoned for over a year because he lacked the wherewithal to post bail.

Trial judges must be mindful of the speedy trial guidelines and strive to observe them in the interest of justice. Superior Court judges should carefully scrutinize the State's arguments about the need for DNA evidence to be tested and related delays. The State's unilateral conclusions about the need for completeness of, and delays resulting from, DNA testing cannot give the State *carte blanche* for continuances. The facts impel us to conclude that the State alone caused unnecessary and prejudicial delay in the case going to trial. On the Rape Second Degree charge, the State violated Dabney's constitutional rights to a speedy trial.

### CONCLUSION

For the above reasons, we reverse the conviction for Rape Second Degree, and remand to the Superior Court for dismissal of the Rape Second Degree charge and resentencing on the remaining charges.