Lawrence **MICHAELS**, Defendant Below, Appellant,

v.

**STATE** of Delaware, Plaintiff Below, Appellee.

Tyreese Hawthorne, Defendant Below, Appellant,

v.

State of Delaware, Plaintiff Below, Appellee.

Andre Wright, Defendant Below, Appellant,

v.

State of Delaware, Plaintiff Below, Appellee.

**Nos. 334, 2008, 358, 2008, 373, 2008.**

Supreme Court of Delaware.

Submitted: Jan. 28, 2009.
Decided: March 17, 2009.

---

Nicole M. Walker, Esquire, Office of the Public Defender, Wilmington, Delaware; for Appellant Michaels.

Andrew W. Gonser, Esquire, of Gonser and Gonser, P.A., Wilmington, Delaware; for Appellant Hawthorne.

Jan A.T. van Amerongen, Jr., Esquire, Wilmington, Delaware; for Appellant Wright.

James T. Wakley, Esquire, Department of Justice, Wilmington, Delaware; for Appellee.

Before STEELE, Chief Justice, BERGER and JACOBS, Justices.

JACOBS, Justice.

Lawrence Michaels, Tyreese Hawthorne and Andre Wright, the codefendants below, appeal from final judgments of conviction by the Superior Court. All three defendants claim that the Superior Court abused its discretion by denying a motion for a mistrial after the introduction of allegedly irrelevant and prejudicial evidence. Michaels and Hawthorne raise additional claims. Michaels separately claims that the trial judge violated his right to a fair trial by asking the prosecutor to stand several feet away from him (Michaels) while questioning him about a gun the prosecutor was holding. Hawthorne separately claims that his speedy trial rights were violated and that the evidence was insufficient to convict him of First Degree Robbery. We granted the State's motion to consolidate these three appeals. We find that the Superior Court neither abused its discretion nor erred as a matter of law. Therefore, we affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

During the afternoon of April 3, 2006, co-defendants Michaels and Wright, while riding their motorcycles around Philadelphia, stopped to play a game of dice with Hawthorne. Defendant Hawthorne then asked Michaels and Wright to go for a ride with him, because he (Hawthorne) needed to "pick up his money." Hawthorne also asked Saladine Pitts, an acquaintance, to drive them in his car. The four drove to Houlihan's, a restaurant in Philadelphia, and upon arriving there, Hawthorne exited Pitts' car and got into a car driven by Rasheem Sims. About four minutes later, Hawthorne returned to Pitts' car, which then followed Sims down I–95 to Bear, Delaware. Sims parked his car, and Pitts then parked his car a distance away.

While Sims was walking back to his apartment, he heard people running behind him. Those persons turned out to be the defendants and Pitts (collectively the "robbers"), who attacked Sims from behind, struck him several times with a metal object, went through Sims' pockets and then led him, at gunpoint, to his apartment. When the group reached the door of the apartment, Sims rang the doorbell. Crystal Donald, Sims' girlfriend, answered the door. When she saw that Sims was bleeding from a head wound, she began screaming. The robbers pushed their way into the apartment, forced Sims into his bedroom, and began searching for money.

Donald was led into the kitchen at gunpoint and robbed of her jewelry. Tashika Townsend, Donald's sister, was forced into her bedroom and then into the kitchen. Donald's daughter was also brought into the kitchen. Shortly thereafter, one of the robbers opened the door and yelled "the law is here!" The robbers then forced Donald to take them to the balcony. The robbers leapt over the railing and crashed onto the balcony below. From there, the robbers forced their way into the adjoining apartment, threatened its resident, Daniel Moran, and demanded that he let them out. While the robbers were threatening Moran, a laser light shined into the apartment, causing the robbers to panic. Three of the robbers fled deeper into Moran's apartment.

At that point, New Castle County Police Department ("NCCPD") officers burst into Moran's apartment and apprehended Pitts in the living room. They found the other robbers hiding in various places in that apartment—Wright under a mattress in a bedroom, Hawthorne in a bathtub and Michaels under a pile of clothing in a closet. The police took all four robbers into custody, searched them, and recovered property belonging to Sims, Donald and Townsend. The police also found, on Hawthorne's person, a "RAZR" cell phone that belonged to Townsend. Later that night the officers recovered two guns—one on the deck behind Moran's apartment and another on the ground behind the building. A third gun was found in Moran's apartment several days later.

On May, 14, 2007, Michaels, Hawthorne and Wright were indicted on (*inter alia*) three counts of First Degree Robbery, two counts of Second Degree Burglary, and First Degree Kidnapping. The case was initially set for trial on November 6, 2007, but was continued until December 13, 2007, because the prosecutor was trying another case. The State requested another continuance, which was denied. Trial did not go forward on December 13, however, because the trial court's trial calendar was full. Ultimately, trial was scheduled to begin on February 26, 2008.

During the trial, on February 29, 2008 (a Friday), Officer Keith Gautier, the NCCPD officer who apprehended Michaels, testified. The prosecutor asked Of-

ficer Gautier whether "there was anything specific ... about [Michaels] that you ... recall." Officer Gautier responded: "I recall that on his face he had a teardrop tattoo." A teardrop tattoo indicates that a person either has gang affiliations, has been in prison, or has participated in a murder. At a sidebar conference, Michaels' counsel objected to Officer Gautier's testimony about the tattoo, and moved for a mistrial. Counsel for Hawthorne and Wright joined in that motion.

Before ruling on the mistrial motion the trial judge questioned the attorneys extensively about whether Officer Gautier's testimony was unduly prejudicial. The State argued that it was not, because the testimony merely established Michaels' presence in Moran's apartment. The trial court asked Michaels' counsel if he would stipulate to his client's presence at the scene, but counsel would not agree. The trial judge then noted that motions *in limine* are regularly used to bar the introduction of evidence, and that the defendants had not moved *in limine* to preclude testimony about Michaels' tattoo. The trial judge further noted that the State was required to prove that Michaels was at the scene, and that because Michaels would not so stipulate, Officer Gautier's identification of Michaels was important to the State's case. The trial judge then informed counsel (without ruling on the motion) that he would give the jury a limiting instruction that they could not consider the nature of the tattoo.

In response, Michaels' counsel offered to stipulate that his client was found in a closet in Daniel Moran's apartment. Counsel also argued that Officer Gautier's testimony about the tattoo was both irrele-

vant and inadmissible under D.R.E. 401 and 403, because none of the victims had ever mentioned a teardrop tattoo. Hawthorne's counsel further objected to the court providing a curative instruction because it would highlight the importance of the tattoo to the jury. Finally, Michaels' attorney requested that the court question the jurors individually to determine if they knew what a teardrop tattoo signified. The judge denied that request as unnecessary and because it would call undue attention to the issue. Officer Gautier had testified late on Friday afternoon, and the trial judge stated that he would give a curative instruction to the jury when they returned on Monday morning.

The following Monday, the trial court heard further argument on Michaels' motion for a mistrial. The trial judge, who over the weekend had conducted internet research on teardrop tattoos, informed the attorneys that teardrop tattoos originally signified that the bearer had committed a murder, usually while in prison. The meaning of the teardrop tattoo had expended, however, also to signify grief over the death of a friend or family member while the bearer was in prison. Although the meaning of the tattoo was not cut and dried, the court noted that it did appear prejudicial to some degree. The trial judge asked the prosecutor why she had not asked Officer Gautier the previous Friday if he saw a teardrop tattoo on Michaels in the courtroom. The prosecutor replied that she had intended to do that, but after the objection and sidebar conference, she decided not to pursue that line of questioning to avoid emphasizing the tattoo. After discussing proposed curative instructions[1] with the attorneys, the trial

---

1. The instruction to which the parties agreed and that the trial judge gave the jury was: I am instructing you to strike from your consideration the testimony of Officer Gau-

tier on Friday that he observed a tattoo on the face of Lawrence Michaels. This means that you may not consider this evidence for

judge ruled that D.R.E. 403 governed the reference to the tattoo, and that under that Rule, Officer Gautier's testimony was probative but not *unduly* prejudicial.

On March 5, 2008, Michaels took the witness stand. The prosecutor asked Michaels several questions about a handgun that was in evidence. While holding that gun, she approached Michaels. A corrections officer present in the courtroom expressed concern to the bailiff about Michaels' proximity to the gun.[2] When the prosecutor later asked for permission to approach the witness (Michaels) with the handgun, the bailiff communicated the corrections officer's concern to the judge. The trial judge then requested that the prosecutor question the witness from where she was standing. After the prosecutor finished her questions, Michaels' counsel requested a sidebar conference at which he moved again for a mistrial, arguing that the court's instruction to the prosecutor prejudiced Michaels by improperly suggesting to the jury that he was a security risk. Counsel for Wright and Hawthorne joined in that motion.

The judge denied the mistrial motion, ruling that the prosecutor had always asked him for permission to approach witnesses, which implied to the jury that the judge had discretion to decide whether to allow an attorney to approach a witness. The trial judge added that he had not observed any unusual response from the jury after politely asking the prosecutor to continue her questioning from where she was standing. Therefore, the court concluded, Michaels was not prejudiced.

The jury convicted all three defendants of most of the crimes charged. The defendants then moved for a judgment of ac-

quittal on several of the charges. Those motions were denied. This appeal followed.

### ANALYSIS

On appeal, the defendants present multiple claims of error. All three defendants claim that the Superior Court abused its discretion by denying a motion for a mistrial after Officer Gautier testified that Michaels had a teardrop tattoo (the "first mistrial motion"). In addition, Michaels separately claims that the Superior Court denied his right to a fair trial by asking the prosecutor to stand several feet away while questioning Michaels about a gun that was in evidence, and also by denying a mistrial motion on that basis (the "second mistrial motion"). And, Hawthorne separately claims that: (i) the reference to the tattoo combined with other cumulative errors required granting a mistrial, (ii) the trial court violated his right to a speedy trial, and (iii) the Superior Court erred by denying his motion for acquittal based on insufficient evidence. We address these claims of error in that sequence.

### I.  The Superior Court Did Not Abuse Its Discretion by Denying the First Mistrial Motion

The Superior Court denied the first motion for a mistrial, on the ground that Officer Gautier's testimony that Michaels had a teardrop tattoo was probative as to Michaels' identity but not unduly prejudicial. Moreover, the trial judge determined, to the extent the reference to the tattoo was prejudicial, a curative instruction would be a sufficient remedy.

---

any purpose and you are to treat this evidence as if it had not been presented to you.

2.  The defendants were in custody because they could not make bail. As a result several corrections officers were in the courtroom at all times.

All three defendants claim that the trial court abused its discretion and advance two related arguments in support of that claim. First, they argue that the testimony regarding Michaels' tattoo violated D.R.E. 403, because its minimal probative value was substantially outweighed by its prejudicial effect. Second, they argue that that testimony violated D.R.E. 404,[3] because it implied gang connections and therefore amounted to prohibited character evidence that Michaels had a propensity for guns and violence. Hawthorne and Wright separately claim that they were prejudiced, because the testimony imputed gang associations to them through Michaels.

The State responds that Officer Gautier's testimony was relevant and not unduly prejudicial, and that in any event, the trial judge's curative instruction cured any potential prejudice. The defendants rejoin that the delay caused by the weekend recess rendered the trial judge's curative instruction ineffective.

Two issues emerge from these contentions. First, was Officer Gautier's testimony that Michaels had a teardrop tattoo inadmissible? Second, if so, was the trial judge's jury instruction adequately curative? If the curative instruction was adequate, then the denial of the defendants'

first mistrial motion would not constitute an abuse of discretion. For that reason we address only the second issue.

■■■ This Court reviews the denial of a motion to declare a mistrial for abuse of discretion.[4] Granting a mistrial is an extraordinary remedy warranted "only when there is 'manifest necessity'"[5] and "no meaningful and practical alternative[ ]."[6] We "recognize[ ] ... the fact that a trial judge is in the best position to assess the risk of any prejudice resulting from trial events" and will reverse the denial of a motion for a mistrial "only if it is based upon unreasonable or capricious grounds."[7] "Error can normally be cured by the use of a curative instruction to the jury, and jurors are presumed to follow those instructions."[8] The defendants do not dispute that the trial judge's curative instruction was sufficient, in the abstract, to cure any error. They argue, however, that the intervening weekend delay so weakened the impact of that instruction as to make it an inadequate remedy.[9]

That argument is unpersuasive. Michaels "cannot point to how the passage of time, without more, unfairly prejudiced him in the eyes of the jury when the instruction itself was properly designed to cure any prejudice."[10] This Court has held that "the temporal constraints of the

3. D.R.E. 404, titled "Character evidence not admissible to prove conduct; exceptions; other crimes."

4. *Bugra v. State*, 818 A.2d 964, 966 (Del. 2003).

5. *Chambers v. State*, 930 A.2d 904, 909 (Del. 2007) (citations omitted).

6. *Dawson v. State*, 637 A.2d 57, 62 (Del.1994) (citing *Bailey v. State*, 521 A.2d 1069, 1077 (Del.1987)).

7. *Revel v. State*, 956 A.2d 23, 27 (Del.2008) (citations omitted).

8. *Guy v. State*, 913 A.2d 558, 565–66 (Del. 2006) (citations omitted).

9. Only Michaels directly advances this argument. The other defendants only argue that Officer Gautier's testimony was improper and do not respond to the State's claim that the trial judge's curative instruction was adequate.

10. *Garvey v. State*, 873 A.2d 291, 300 (Del. 2005) (holding that a "significant" delay in delivering a curative instruction does not render that instruction ineffective in curing prejudice to the defendant).

trial schedule alone cannot give rise to a finding of unfair prejudice sufficient to deny ... a fair trial...."[11] A weekend recess falls within "the temporal constraints of the trial schedule," and a two-day delay did not render the trial judge's curative instruction inadequate. Accordingly, the Superior Court did not abuse its discretion by denying the defendants' first motion for a mistrial.

## II. The Superior Court Did Not Abuse Its Discretion by Denying Michaels' Second Motion for a Mistrial

■ As earlier noted, while the prosecutor was questioning Michaels, a corrections officer expressed concern to the bailiff that the prosecutor was approaching too close to Michaels, since she was holding a gun that was a trial exhibit. The bailiff relayed that concern to the judge. When the prosecutor asked permission to approach Michaels, the judge replied "[y]ou may ask your questions from where you are standing." After the prosecutor finished her questions, Michaels' attorney moved for a mistrial, claiming that instructing the prosecutor to ask her questions from several feet away was prejudicial, because it implied that Michaels was dangerous. The trial judge denied the motion, observing that if during a trial an attorney holding a weapon comes too close to a witness, that could cause a potential security risk. In the judge's view, asking the prosecutor to question the witness from where she was standing was a legitimate and balanced way to address the problem.

On appeal, Michaels claims that the denial of his motion for a mistrial violated his right to a fair trial, because: (1) the ac-

tions of the correction officer, bailiff and judge undermined Michaels' presumption of innocence and unfairly portrayed him as dangerous, and (2) the court erred by not giving a cautionary instruction to the jury.

The State responds that Michaels waived his right to raise this issue on appeal, because he did not object contemporaneously. Therefore (the State argues), any appellate review is limited to plain error,[12] which has not been established here. The State also argues that Michaels suffered no prejudice, because: (1) there is no evidence that the jury noticed this incident, and (2) the jury acquitted Michaels on five counts, which shows that they were not prejudiced against him. Michaels rejoins that he raised his objection at sidebar shortly after the incident occurred and that because he did not waive his objection, this Court should review his fair trial violation claim *de novo*.

These contentions raise two issues. First, was the trial judge's request that the prosecutor interrogate Michaels from several feet away materially prejudicial to him? Second, if so, was the trial court's refusal to grant a mistrial or to issue a cautionary jury instruction an abuse of discretion? Again, we need only address the second issue.

■ Although the remedy that Michaels requested was a mistrial, not a cautionary jury instruction, he now argues for the first time on appeal that the trial judge should have issued a cautionary instruction. Michaels argues conclusorily that a cautionary instruction was legally required, but cites no authority that would require the trial court to do that *sua sponte*.[13] Nor does he articulate any rea-

---

11. *Id.*

12. *Czech v. State*, 945 A.2d 1088, 1097 (Del. 2008).

13. Michaels claims that *Czech v. State*, 945 A.2d 1088, required the trial judge to issue a cautionary instruction. That case is both factually and legally distinguishable. *Czech* in-

son why the judge's failure to issue a cautionary instruction *sua sponte* was erroneous or an abuse of discretion. Michaels' argument must therefore be rejected.

So also must his claim that the trial court should have granted a mistrial. Before ruling on the second mistrial motion the trial judge instructed the bailiff to describe on the record what the corrections officer had told him and also how the bailiff had then approached the judge. The trial judge noted for the record that the jury did not appear to react to the incident at all. The trial judge further observed that in criminal trials, for better or worse, attorneys holding weapons occasionally come too close to a testifying defendant, and that politely requesting the attorney to question the defendant from where she was standing is a proper way to balance the need to avoid prejudice against legitimate security concerns. We agree that the trial judge's measured approach was not "unreasonable or capricious,"[14] and not an abuse of discretion.

### III. There Was No Cumulative Error That Prejudiced Hawthorne

■ Hawthorne separately argues that the Superior Court abused its discretion by denying his second motion for a mistrial based on four other incidents that, taken together, amount to cumulative error. Those other incidents were: (1) in her opening statement the prosecutor mentioned that former co-defendant Saladine Pitts had pled guilty to the crimes with which the defendants were charged; (2) the State elicited testimony from Michaels that the defendants were incarcerated and

had not been able to speak to each other; (3) the trial judge asked the prosecutor to question Michaels about a firearm from several feet away; and (4) in its closing argument the State used a hypothetical involving a shooting in a felony murder situation as an example of accomplice liability. We conclude that this argument lacks merit.

After Hawthorne objected to incident (1), the trial court issued a curative instruction. Although Hawthorne claims that he requested a mistrial after incidents (2)-(4) occurred, he did not appeal from the trial court's denial of that request. Instead, Hawthorne claims that incidents (2)-(4) caused cumulative error, for which reason the trial court abused its discretion by denying the motion for a mistrial after incident (1). The State responds that Hawthorne has failed to show any actual prejudice resulting from any of those events.

The issue is whether Hawthorne suffered any prejudice from the incidents he claims constitute cumulative error, which (he urges) establish that the trial court erred by denying the first motion for a mistrial based upon Officer Gautier referencing Michaels' tattoo. The argument lacks coherence. It presents a claim of cumulative error to support an appeal from a ruling, based on alleged errors that occurred after that ruling was made. The analysis could end at this point, but for the sake of completeness we address Hawthorne's cumulative error argument as if it were an independent claim.

■ Cumulative error must derive from multiple errors that caused "actual preju-

volved exceptional circumstances not present here: the victim, a six-year old child, was permitted to have her mother on the stand with her while she testified about how the defendant raped her. That case is also legally

distinguishable, because Czech, unlike Michaels, specifically requested a cautionary instruction.

14. *Revel v. State*, 956 A.2d 23, 27 (Del.2008).

dice." [15] Here, none of the incidents upon which Hawthorne relies were prejudicial. *First,* after the prosecutor referenced Sims' guilty plea, Hawthorne's attorney requested a curative instruction, which the trial judge granted. *Second,* Michaels' testimony (in response to the prosecutor's question) that he had not spoken to the other defendants since they were arrested and incarcerated, did not prejudice Hawthorne. It was obvious that the defendants had been arrested. And, although some minimal prejudice may result from the jury being told that the defendants were incarcerated at the time of trial, Michaels' testimony was not the only source of that information. Multiple corrections officers were present in the courtroom to supervise the defendants, making it obvious that the defendants were in State custody. That fact, which Hawthorne does not confront, eviscerates his contention that Michaels' testimony prejudiced the jury against him. *Third,* we have earlier concluded that Michaels was not unfairly prejudiced by the trial judge asking the prosecutor to question him about a firearm from several feet away. *Fourth,* there was no prejudice from the State's use of a felony murder hypothetical during argument while explaining accomplice liability. Although Hawthorne claims that his attorney requested a mistrial after that incident, in fact, no mistrial was requested.[16] Hawthorne's attorney asked the court to instruct the prosecutor to move on, and the trial judge did that. Having received the remedy his attorney requested, Hawthorne cannot now argue that he was prejudiced.

For these reasons, Hawthorne has failed to establish any cumulative error.

## IV. The State Did Not Violate Hawthorne's Right to a Speedy Trial

■ Hawthorne next claims that the State violated his Sixth Amendment speedy trial right, because (due to his inability to post bail) he was incarcerated for 328 days between his arrest and the beginning of trial. The State argues that the delay was not unreasonable and that Hawthorne has failed to show any prejudice. The issue presented is whether the length of Hawthorne's pre-trial incarceration was unreasonable.

■ This Court reviews claims alleging the infringement of a constitutionally protected right *de novo.*[17] In determining whether a defendant's speedy trial right has been violated we apply the four *Barker v. Wingo*[18] factors: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant as a result of the delay.[19] We must first conclude that length of the delay is unreason-

---

15. *Fahy v. Horn,* 516 F.3d 169, 205 (3d Cir. 2008) (citations omitted).

16. Counsel: *Without a cure,* it may create a mistrial at this point.
. . .
Trial Judge: What is your application as to how to cure, if even a curative is appropriate? . . . Counsel: Disregard the State's last example and let's move on.
. . .
Trial Judge: I'm going to, I think with defense counsels' agreement, sustain the objection and direct you to move on.

17. *Dabney v. State,* 953 A.2d 159, 163 (Del. 2008) (citing *Keyser v. State,* 893 A.2d 956, 961 (Del.2006)).

18. 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972) (adopted by *Johnson v. State,* 305 A.2d 622, 623 (Del.1973)).

19. *See Dabney,* 953 A.2d at 163–64 (citing *Barker,* 407 U.S. 514, 530–31, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)).

able in order to reach the remaining three factors.[20]

Here, we need only address the first *Barker* factor—the length of the delay. Hawthorne was incarcerated for 328 days before his trial started.[21] That delay, Hawthorne claims, was unreasonable, because the Superior Court speedy trial standards seek to hold 90% of criminal trials within 120 days of indictment, 98% within 180 days and all cases within one year.[22] Those standards are not codified in law.[23] We have held that delays greater than one year are presumptively unreasonable,[24] and have implicitly held that lesser delays are not unreasonable.[25] Because Hawthorne was held for less than one year before his trial, he has failed to establish that the length of the delay was unreasonable.

We do not intended to suggest that by rejecting Hawthorne's speedy trial claim, this Court condones a 328 day delay between the time of arrest and the time of trial, during which the defendant is incarcerated. The State and the Superior Court must make every reasonable effort to minimize delay in starting a trial in cases where the defendant is incarcerated. In this case the delay was the result of the prosecutor being unable to try the case on the original trial date, and the court's already full trial calendar on the second. Although no one deserves to be commended for that delay, we are unable to con-

clude that the delay was one of constitutional dimension.

## V. Sufficient Evidence Was Produced At Trial To Support Hawthorne's First Degree Robbery Conviction

█ Lastly, Hawthorne claims that the evidence was insufficient to support a conviction of First Degree Robbery, and that the trial court erred in holding otherwise. Hawthorne was charged with First Degree Robbery based on a cell phone that had been taken from Tashika Townsend's purse. Hawthorne moved for a judgment of acquittal, and to have the charge reduced to the lesser included offense of misdemeanor theft, because there was no evidence that Hawthorne had taken any steps to compel Townsend to give him her cell phone. The trial court denied that motion, ruling that circumstantial evidence and the theory of accomplice liability permitted the jury to find that all the elements of First Degree Robbery had been proven as to Hawthorne.

On appeal, Hawthorne claims that the trial court erred, because Townsend was unaware that her phone was taken from her purse and there was no evidence that Hawthorne intended to compel Townsend to give it up. The State responds that under the theory of accomplice liability, there was sufficient evidence for the jury to conclude that Hawthorne committed First Degree Robbery.

20. *Dabney*, 953 A.2d at 164 (citing *Hughey v. State*, 522 A.2d 335, 341 (Del.1987)).

21. Hawthorne was indicted on May 14, 2007. 288 days passed between Hawthorne's indictment and the start of trial.

22. *See Dabney*, 953 A.2d at 165 n. 16 (citing Supreme Court of Delaware Administrative Directive 130 (July 11, 2001)).

23. *See Dabney*, 953 A.2d at 165.

24. *Id.*

25. *See, e.g., Malin v. State*, 954 A.2d 910, 2008 WL 2429114, at *2 (Del. June 17, 2008) (Table) (holding that a delay of nearly one year between arrest and trial failed to present a *prima facie* speedy trial claim); *Skinner v. State*, 575 A.2d 1108, 1116 (Del.1990) (holding that the period of time necessary to trigger speedy trial rights is approximately one year).

Whether a rational jury could have found Hawthorne guilty of Robbery turns upon the proper construction of the robbery statute. That is a matter of law which we review *de novo*.[26] We also review *de novo* the denial of a motion for a judgment of acquittal based on insufficiency of evidence,[27] our inquiry being "whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find the defendant guilty beyond a reasonable doubt."[28]

To prove First Degree Robbery, the State must establish the elements of Second Degree Robbery, plus an additional aggravating factor. One statutory aggravating factor is the use of a deadly weapon.[29] Three guns were recovered from the crime scene, and a rational jury could have found that Hawthorne used a gun that night.

The relevant elements of Second Degree Robbery are: (1) theft, (2) the use of force or a threat of the immediate use of force, with (3) intent to compel the owner of property to deliver up the property or engage in other conduct which aids in the commission of the theft.[30] Hawthorne concedes that he stole Townsend's phone. The victims' testimony that the defendants forced their way into the apartment at gunpoint, viewed in the light most favorable to the State, is sufficient for a rational jury to conclude that Hawthorne used force or the threat of immediate force while taking property from Sims' apartment. Thus, Hawthorne's insufficient evidence claim turns on whether the State satisfied the third element of Robbery—that Hawthorne intended to compel the owner to give up the property or engage in other conduct aiding in the commission of the theft.

Hawthorne claims there was no evidence that he compelled, or had any intent to compel, Townsend to give up her phone. The short answer is that Townsend was attempting to use her phone to call for help, when one of the defendants ordered her to stop and go into the kitchen. That conduct facilitated the theft of the phone, and was "other conduct which aids in the commission of the Theft." The defendants had already beaten Sims and had forced their way into his apartment—a clear threat that the defendants would use force if the victims did not obey their orders. Ordering Townsend into another room facilitated Hawthorne stealing her phone, by making it easier for Hawthorne to seize it. As a matter of law, the Robbery statute encompasses situations that go beyond merely physically forcing a victim to turn over property. A rational jury could conclude based on the State's theory of accomplice liability, that Hawthorne committed First Degree Robbery by stealing Townsend's phone after the defendants entered the apartment at gunpoint, and he or an associate had ordered her into the kitchen.

## CONCLUSION

For the reasons set forth above, the judgments of the Superior Court are affirmed.

**26.** *Levan v. Independence Mall, Inc.*, 940 A.2d 929, 932 (Del.2007).

**27.** *Seward v. State*, 723 A.2d 365, 369 (Del. 1999).

**28.** *Id.* (citations omitted).

**29.** 11 *Del. C.* § 832(a)(2).

**30.** 11 *Del. C.* § 831.