# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| STATE OF DELAWARE | ) | |
| | ) | |
| v. | ) | ID No. 2206000799 |
| | ) | |
| KATHLEEN MCGUINESS | ) | |
| | ) | |
| Defendant. | ) | |

Submitted: August 1, 2022
Decided: August 30, 2022

**Defendant's Motion for Judgment of Acquittal – GRANTED in part
and DENIED in part
Defendant's Motion for a New Trial – DENIED**

## MEMORANDUM OPINION

Mark A. Denney, Jr., Esquire, Maria Knoll, Esquire, and Nicole Mozee Esquire, Department of Justice, 820 North French Street, 7th Floor, Wilmington, Delaware 19801.  Attorneys for State of Delaware.

Steven P. Wood, Esquire, Chelsea A. Botsch, Esquire, and Dean A. Elwell, Esquire, McCarter & English, LLP, Renaissance Centre, 405 North King Street, 8th Floor, Wilmington, Delaware 19801.  Attorneys for Defendant.

**CARPENTER, J.**

Before this Court is Defendant's Motion for Judgment of Acquittal and Motion for a New Trial. For the reasons set forth in this Opinion, Defendant's Motion for Judgment of Acquittal is **GRANTED in part and DENIED in part** and Defendant's Motion for a New Trial is **DENIED**.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On June 6, 2022, the Defendant was indicted by a Grand Jury in Kent County, Delaware.[1] Defendant was charged with Conflict of Interest (Count One), Felony Theft (Count Two), Structuring: Non-Compliance With Procurement Law (Count Three), Official Misconduct (Count Four), and Act of Intimidation (Count Five).[2]

On June 14, 2022, the Court began a jury trial in this matter.[3] The State rested its case-in-chief on June 28, 2022, and the Defendant moved for a judgment of acquittal on each of the five counts pursuant to Rule 29(a).[4] The Court reserved its decision and Defendant put on her case, resting on June 29, 2022.[5] On June 30, 2022, the parties presented closing arguments and the Court instructed the jury on the law.[6]

---

[1] Def.'s Mot. for J. of Acquittal, D.I. 39, at ¶6 (July 20, 2022).
[2] Kent Co. Indictment, D.I. 1 (June 6, 2022).
[3] Def.'s Mot. for J. of Acquittal at ¶4.
[4] *Id*. at ¶5.
[5] *Id*. at ¶6.
[6] Trial Tr. June 30, 2022, Case No. 2206000799.

On July 1, 2022, the twelve-person jury found Defendant guilty on Counts One, Three, and Four of the Indictment.[7] Defendant promptly renewed her Rule 29(a) motion and informed the Court of her intention to file a Rule 29(c) motion and a Rule 33 motion.[8]

On July 20, 2022, Defendant timely submitted a Renewed Motion for Judgment of Acquittal and a Motion for a New Trial.[9] The State responded on July 25, 2022.[10] On August 1, 2022, the Defendant submitted a reply in support of her motions for Judgment of Acquittal and New Trial.[11] This is the Court's decision on the Defendant's motions.

## II. DISCUSSION

### A. Motion for Judgment of Acquittal

#### 1. Standard of Review

A motion for judgment of acquittal is governed by Superior Court Criminal Rule 29, which provides that such motions should be presented at the close of the State's evidence, or within seven (7) days after the jury is discharged.[12] "The court on motion of a defendant or of its own motion shall order the entry of judgment of

---

[7] Def.'s Mot. for J. of Acquittal at ¶8.
[8] *Id.* at ¶8.
[9] Def.'s Mot for J. of Acquittal at p. 38; Def.'s Mot. for a New Trial, D.I. 40, at p. 57 (July 20, 2022).
[10] State's Resp. to Def.'s Mot. for J. of Acquittal and New Trial, D.I. 41, at p. 20 (July 25, 2022).
[11] Def.'s Reply in Support of Her Motions for J. of Acquittal and New Trial, D.I. 42, at p. 40 (Aug. 1, 2022).
[12] Super. Ct. Crim. R. 29.

acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed if the evidence is insufficient to sustain a conviction of such offense or offenses."[13]

The standard of review for a motion for judgment of acquittal is whether any rational trier of fact, viewing the evidence in the light most favorable to the State, could find a defendant guilty beyond a reasonable doubt of all the elements of the crime.[14] "Evidence that is insufficient to support a conviction warrants reversal, but the mere fact that the evidence is in conflict does not."[15] As such, the Court will not supplement its position over the jury's, when there is sufficient evidence to support the jury's finding. Upon consideration of a motion for judgment of acquittal, the evidence and all reasonable inferences are considered in the light most favorable to the State.[16]

### 2. Analysis

### a. Count One – Conflict of Interest

First, the Defendant contends that in order to be guilty of Conflict of Interest, Elizabeth "Saylar" McGuiness ("Daughter") must have received a financial benefit to a greater extent than other similarly situated employees at the Delaware State

---

[13] *Id.*
[14] *State v. Williams*, 2015 WL 351872, at *1 (Del. Super. Ct. Jan. 27, 2015).
[15] *State v. Dixon*, 2022 WL 2840041, at *2 (Del. Super. Ct. July 20, 2022).
[16] *Id.*

4

Office of Auditor of Accounts ("OAOA").[17] But Defendant argues that no rational jury could place the three individuals referenced in the Indictment, Lizbethmary Vargas, Rooslie Maurice, and Lydia August, in the "same class or same group of persons" nor find that Daughter received a greater financial benefit than those individuals.[18] Defendant contends that Daughter and the other casual/seasonal employees were subjected to the same hour restrictions and same tasks.[19] Also, two other casual/seasonal interns, Virginia Bateman and Kyra Marshall, testified that they were permitted to "bank" hours for weeks they exceeded their hour restrictions.[20]

The Defendant asserts that while the evidence presented during the trial reflected that Daughter was the only casual/seasonal college employee permitted to continue her work remotely while away at college, there is no evidence to suggest that other casual/seasonal employees were denied the same privileges.[21] While the records reflect that the Daughter held a position that would allow her to work beyond the 29.5 hours limitation for seasonal/casual employees, the Defendant argues the evidence demonstrates she never did and the higher allotted hours in the system was a clerical mistake.[22] Finally, Defendant argues that Vargas, Maurice, and August all

---

[17] Trial Tr. June 28, 2022, Case No. 2206000799, at 179 (2022).
[18] Def.'s Mot. for J. of Acquittal at ¶¶14-15.
[19] *Id*. at ¶¶28, 30.
[20] *Id*. at ¶29.
[21] *Id*. at ¶32-33.
[22] *Id*.; Trial Tr. June 28, 2022, at 180.

5

resigned for personal reasons and were not fired by the OAOA due to Daughter's employment.[23]

Conversely, the State argues that the evidence produced at trial established that the Defendant participated in the review of disposition of a matter pending before the State in which she had a personal or private interest.[24]  The State asserts that the Defendant was the Daughter's immediate supervisor and highlights several official documents confirming that status, such as Daughter's "onboarding" paperwork.[25]  Moreover, the State highlights the Daughter's informal hiring, available work hours, ability to work remotely while attending college out of state, "banked" hours applied to later weeks, inactivity on her State email and State VPN, and Defendant's handling of Daughter's work complaints about OAOA staff.[26]  The State argues that these bases support that Count One was proved beyond a reasonable doubt, and urges the Court to uphold the jury's accurate finding that Defendant is guilty.[27]

Before addressing the elements of this offense, the Court wants to emphasize that there is no statute that prohibits a state officer such as the Auditor from hiring a close relative.  However, when this occurs, the state officer must remove themselves

---

[23] Def.'s Mot. for J. of Acquittal at ¶¶38-39.
[24] State's Resp. at 4.
[25] *Id*. at 4.
[26] *Id*. at 4-5.
[27] *Id*. at 5.

from the hiring decision and allow the normal administrative function of the office to make the decision, particularly when they have a personal or private interest in that decision. While the Court is not naïve enough to believe these decisions would generally be contrary to the wishes of the state officer, the Delaware code[28] at least provides some minimum oversight in the process.

Here it is difficult to even suggest that Defendant did not have a personal interest in the hiring decision. A summer job for Daughter and Daughter's friends clearly by any commonsense analysis would end in the conclusion that Defendant had a personal interest in this matter. As a result, Defendant's conduct was required to be consistent and in compliance with that set forth in 29 *Del. C.* § 5805, and her failure to exercise reasonable and good judgment here placed her in jeopardy of violating that statute.

Conflict of Interest required the State to prove beyond a reasonable doubt that (1) the Defendant was a "state officer" at the time of the charged offense; (2) the Defendant "participated on behalf of the State in review or disposition of a matter pending before the State," and (3) the matter was one in which the Defendant had a "personal or private interest."[29] The first element is easily satisfied as it is undisputed that the Defendant was serving as the Delaware State Auditor during the

---

[28] *See generally* 29 *Del. C.* § 5801 ("State Employee's, Officer's and Official's Code of Conduct").
[29] 29 *Del. C.* §5805.

7

dates alleged in the Indictment. She began her tenure as the State Auditor in January of 2019 and remains in that position.

Next, the evidence clearly established that the Defendant participated in the hiring and supervising of Daughter as a casual/seasonal worker in 2020. It appears that Daughter did not apply nor sit for a formal interview but was hired at the insistence of her mother. It was also established that Defendant generally oversees the hiring and firing of personnel in her office, and immediately oversaw that of Daughter's, as evidenced by the Defendant's signature on various official employment documents. Additionally, the Defendant directly oversaw and assigned work to Daughter while she was employed at the OAOA. There was sufficient evidence presented to the jury which established the second element of this offense.

The final element relates to the state officer's "personal or private interest" in a matter and is defined in the code as meaning "an interest which tends to impair a person's independence of judgment in the performance of the person's duties with respect to that matter."[30] The statute specifically reflects that when "a financial benefit may accrue to a close relative to a greater extent than such benefit to others who are members of the same class or group of persons" the state officer's judgment and independence is impaired.[31]

---

[30] Jury Instructions, Case No. 2206000799, at 6 (June 30, 2022); Trial Tr. June 30, 2022, at 116.
[31] *Id*.

8

Even when evidence regarding the use of state vehicles, the "banking" of hours, or the work performed by Daughter is removed, the bottom line, which is undisputed, is that Daughter was allowed to continue to work after she left Delaware to attend college in Charleston, South Carolina and received payments during those months. This extra salary earned while away at school is a sufficient financial benefit secured by Daughter and one, based on the evidence presented, that was not granted to other casual/seasonal employees during the same timeframe. The evidence clearly established that Daughter was not present in the OAOA during this timeframe and did not utilize her state email to transmit the work that she was allegedly performing for the OAOA.

The decision whether to accept Daughter's testimony as to the work she allegedly performed while in South Carolina is a credibility decision to be made by the jury and not the Court. The Court, however, is satisfied there was a reasonable basis for the jury to conclude this was a benefit unique to Daughter's situation and not one generally available to other casual/seasonal employees at the OAOA.

In sum, Defendant's poor judgment allowed a close relative to receive a greater financial benefit than others similarly situated and there can be no other reasonable conclusion based upon the facts presented during the trial. Therefore, the Court will not disturb the jury's decision. The Court finds the State has met its

9

burden of proving beyond a reasonable doubt the elements of the conflict of interest statute and the Motion for Judgment of Acquittal on Count One is **DENIED**.

### b. Count 3 – Structuring: Non-Compliance With Procurement Code

Next, Defendant challenges the jury's finding of her guilt as to Count Three Structuring: Non-Compliance With the Procurement Code. To start, Defendant attacks the State's legal theory underlying Count Three and argues that the fragmenting of payments of a contract cannot form the basis for a violation of 29 *Del. C.* § 6903(a) ("Section 6903(a)") because the plain language of the statute requires that a contract be fragmented, not payments under a contract.[32]

And, even if the State furthered a viable legal theory, the Defendant argues that the State has failed to prove that Defendant had the requisite *mentes reae* for this charge, in that she willfully fragmented or subdivided the My Campaign Group ("MyCG") contract into multiple parts somehow with the intent to avoid compliance with the State Procurement Code.[33] Defendant asserts that the evidence shows the circumstances surrounding the MyCG were a result of staff turnover and confusion that ultimately resulted in miscommunication and scrambled attempts to pay an overdue invoice to a valued vendor.[34]

---

[32] Def.'s Mot. for J. Acquittal, at ¶¶55-57.
[33] *Id*. at ¶43.
[34] *Id*. at ¶¶64-71; Trial Tr. June 28, 2022, at 185.

Conversely, the State asserts that it provided sufficient evidence to support Count Three and specifically, the Defendant's mental state.[35] The State contends that the Defendant intended to violate 29 *Del. C.* § 6981 ("Section 6981"), which governs professional service procurement process for contracts that are larger than the threshold amount.[36] The State argues that Defendant clearly sought to avoid compliance with the State Procurement Code when she inquired about splitting payments due under the September 2020 MyCG invoice, and then ordered her Chief of Staff, Thomas Van Horn, to make a PayPal payment to MyCG on a state credit card.[37] And, the State argues that Defendant was aware of but failed to submit an after-the-fact waiver ("ATF Waiver") and follow proper accounting procedures.[38] The State argues that the Defendant directed payments to MyCG to avoid oversight and Division of Accounting approval, and therefore, the requisite mental state to support this Count has been established.[39]

In response, the Defendant asserts that the splitting of payments, which is prohibited by the Budget and Accounting Policy Manual ("BAPM"), is not codified in a criminal statute because the General Assembly never intended to criminalize all violations of the agency manual.[40]

---

[35] State's Resp. at 6-7.
[36] 29 *Del. C.* §6981.
[37] State's Resp. at 6.
[38] *Id.*
[39] *Id.*
[40] Def.'s Reply at ¶22.

11

For Count Three, the State was required to prove beyond a reasonable doubt that (1) the Defendant entered into a contract for professional services, (2) the Defendant willfully fragmented or subdivided the contract, and (3) the Defendant's fragmentation or subdivision of the contract was made with the intent to avoid compliance with the State Procurement Code.[41]

On May 13, 2022, the Court explained in an Opinion that the State had adequately alleged this Count but would be required to establish at trial the section of Chapter 69 that the Defendant had violated.[42] The State submits that Defendant intended to violate Section 6981 of the State Procurement Code which provides that "[a]ny state contract for which an agency is a party…greater than the threshold amount…will be subject to the provisions of this subchapter."[43] During the relevant period, the contract threshold was $50,000[44] and there was a $5,000 threshold that required invoices to be reviewed and approved by the Division of Accounting.[45] In addition, the BAPM advised that invoices could not be split into multiple payments to avoid review and oversight by the Division of Accounting.[46]

The procurement statute violation has been a difficult one for the State to establish as it is the classic example of trying to fit conduct into a statute for which

---

[41] 29 *Del. C.* §6903.
[42] *State v. McGuiness*, 2022 WL 1538488, at *4 (Del. Super. Ct. May 13, 2022).
[43] 29 *Del. C.* § 6981.
[44] Trial Tr. June 15, 2022 P.M., Case No. 2206000799, at 51.
[45] *Id*. at 77.
[46] *Id*. at 68; State's Ex. 49 (Ch. 7 of BAPM) at §§7.2, 7.3.1.

it was never intended to address. The State's initial theory in the case was that the Defendant violated Section 6903(a) when she had manipulated a contract to ensure that when executed it did not violate the $50,000 threshold to avoid placing it out for bid, conduct clearly contemplated by that section of the code.

When it became evident there was no splitting of the initial contract into two or more separate ones, however, the State's theory mollified into a theory that when one intentionally breaks invoices down into smaller amounts to avoid the $5,000 review threshold, such conduct would violate Section 6981 and be subject to the criminal penalties listed in Section 6903(a). The problem with relying upon Section 6981 is that subchapter of Chapter 69 does not criminalize that conduct. While clearly a violation of the State's accounting procedures, neither the legislature nor the Division of Accounting has sought criminal penalties for this violation.

Moreover, it is true that the early monthly invoices were less than $5,000, but the evidence reflects this was simply due to the limitation the vendor self-imposed upon herself because she was only recently returning from maternity leave and did not want to be overworked during this period. There was no evidence that the invoices were intentionally manipulated to avoid the $5,000 accounting review procedure and, in fact, two of the invoices toward the end of the contract exceeded $9,000 and were submitted for payment and approved by the Division of Accounting. If the State's theory of intentional manipulation of invoices was

correct, clearly these invoices would have been broken up and submitted in an amount to avoid review. That simply did not occur.

Finally, the evidence clearly established the process for granting relief from exceeding either the $5,000 invoice approval requirement or the total contract amount of $50,000 was routine and regularly approved. At trial a mountain of ATF Waivers was introduced, some exceeding millions of dollars that had not obtained accounting pre-approval and were regularly granted after the transaction. The Court has no question that an overage of only a few thousand dollars would have raised no red flags and been approved without question. As such, the criminalization of the failure to submit a routine accounting form was never intended by the legislature nor the Division of Accounting.

After reviewing the evidence, it appears that the MyCG contract was properly executed between the OAOA and MyCG because it was below the $50,000 threshold and not subject to the provisions in Section 6981. And the fact that at the end of the contract, the total amount exceeded the $50,000 threshold amount is irrelevant. While the Defendant's conduct is arguably improper pursuant to the relevant accounting rules, the Court cannot find that *any* violation of those rules is criminal. As such, the State has failed to connect the Defendant's conduct to any wrongdoing in the Delaware Code.

14

Even if the State had offered a relevant section of the State Procurement Code, the Court is not satisfied that Defendant's violation of Count Three has been proven beyond a reasonable doubt. In fact, it appears that the evidence produced shows no more than an improper accounting procedure followed by the Defendant's office, during a time when there was high staff turnover and delays in employee training complicated by the COVID-19 pandemic.

The evidence also shows that the Defendant relied on her administrative and accounting staff to handle the transaction, while admitting that the State Procurement Code "is not in [her] wheelhouse."[47] It appears that Defendant questioned her accounting staff about various ways to pay the MyCG invoices that would comply with relevant accounting principles and relied on her staff to confirm that such processes could be done. Unfortunately, her Chief of Staff was inexperienced and while perhaps politically savvy, lacked any degree of reasonable sophistication as to the inner workings of the State's accounting procedure. Without the appropriate staff familiar with the accounting process, the situation here was simply a comedy of errors and not criminal conduct.

The Court therefore finds that there is insufficient evidence to support a conviction on Count Three and the Defendant's Motion for Judgment of Acquittal on that Count is **GRANTED**.

---

[47] Def.'s Mot for J. Acquittal at ¶82; Def.'s Ex. 123.

### c. Count Four – Official Misconduct

Lastly, Defendant argues that Official Misconduct is not a catchall for any alleged misconduct, and because its fate rests on Counts One and Three, it must also fail.[48] Whereas the State contends that it proved multiple ways that the Defendant conferred a personal benefit at the Defendant's request upon a third person.[49]

Under Delaware law, Official Misconduct requires that (1) the Defendant was a public servant at the time of the charged offense, (2) the Defendant intended to obtain a personal benefit, or cause harm to a person; and (3) the Defendant either committed an act constituting an unauthorized exercise of official functions, knowing that the act is unauthorized, or the Defendant performed an official function in a way intended to benefit the Defendant's own property or financial interests, under circumstances in which the Defendant's actions were not reasonably justified in consideration of the factors which ought to have been taken into account in performing official functions.[50] Obviously the Defendant was a public servant at the time of this offense and therefore the Court will proceed to review the remaining two elements of this offense.

The official misconduct statute found in 11 *Del. C.* § 1211 is intentionally broad to encompass a wide range of inappropriate conduct by state officials. At its

---

[48] Def.'s Mot. for J. of Acquittal at ¶ 85; Trial Tr. June 28, 2022, at 186.
[49] State's Resp. at 8.
[50] Jury Instructions at 15-16; Trial Tr. June 30, 2022, at 121-22.

core, the statute prohibits a state official from receiving a personal benefit and in return either performing an unauthorized act or some act that results in the receipt of a property or financial benefit to that official.

At trial, it was clear that the Defendant had a different view of the role of the Auditor's Office from her predecessor and intended to dramatically increase the public knowledge and perception of the office. This led to an increased use of social media, the implementation of special reports regarding the different functions of state government and leading a regional effort to ensure the appropriate use of COVID-19 funding.

These efforts raised the prominence of the office and in return the Defendant personally and were critical to the decisions to hire her daughter who had social media skills at least beyond those in the office and enter into the contract with Christie Gross of MyCG.[51] Gross's expertise was creating effective messaging and communicating those messages to the public and the MyCG contract was intended to do just that. So clearly the hiring of the Defendant's daughter and the contract with MyCG were at least partially intended to directly benefit the Defendant personally.

---

[51] While the Court has found the jury's verdict as to Count Three was not supported by the evidence, the facts surrounding the interaction between MyCG, Christie Gross and the Defendant can still be considered and are relevant to whether the facts support the Official Misconduct offense found in Count Four. Count Three is a technical one relating specifically to the procurement process while Count Four is broader in scope and relates to the relationship between the Defendant, Daughter and MyCG.

The final element is that the Defendant performed official functions in a way intended to benefit her property or financial interest. While an odd term to use in the context of Official Misconduct, the Court believes the word "property" was intended to be broad in scope and would encompass benefits beyond those of a financial nature. This would include reputation, status, effectiveness, and perhaps even in the context of an elected official, one's electability. There is no question that the efforts made in social media by the Defendant's daughter as well as the communication efforts led by Christie Gross were intended, to a significant degree, to promote the Defendant individually. There was evidence to suggest that the Defendant clearly wanted to emphasize her position as the State Auditor and it was her name and not the office that would be prominent in all communications that were made public. Whether this conduct was reasonably justified in the performance of her official function was one for the jury to decide. The Court, however, finds the State has presented sufficient evidence to support this element of the offense and the jury had a reasonable basis to render a guilty verdict on this count. Based upon the above, the Defendant's Motion for Judgment of Acquittal as to Count Four is **DENIED**.

### B. Motion for a New Trial

#### 1. Standard of Review

A motion for a new trial is governed by Superior Court Criminal Rule 33, which provides that such a motion must be made within seven (7) days after verdict or finding of guilty or within such further time as the court may fix during the seven-day period.[52]  A trial court has discretion to grant a new trial if it is required in the interest of justice.[53]  A new trial is warranted "only if the error complained of resulted in actual prejudice or so infringed upon defendant's fundamental right to a fair trial as to raise a presumption of prejudice."[54]

#### 2. Analysis

The Defendant raises six arguments to support her motion for a new trial as to Counts One, Three, and Four. [55]

#### a. Defendant alleges *Brady* violations

First, Defendant asserts that the State failed to uphold its *Brady* obligations when it failed to search voluminous discovery and produce it in an easily accessible manner pursuant to 29 *Del. C.* § 2508(b).[56]  Defendant contends that the State's

---

[52] Super. Ct. Crim. R. 33.
[53] *Id.*; *See also State v. Biddle*, 2022 WL 102376, at *1 (Del. Super. Ct. Jan. 10, 2022).
[54] *State v. Ryle*, 2015 WL 5004903, at *1 (Del. Super. Ct. Aug. 14, 2015).
[55] Def.'s Mot. for New Trial, at p. 1.
[56] *Id.* at ¶18.

*Brady* violation prejudiced her at trial and can only be remedied by the ordering of a new trial.[57]

The State argues that it upheld its *Brady* obligations because the State diligently searched filtered material for exculpatory and relevant evidence, and did not suppress but rather provided that evidence to Defendant.[58] Moreover, the State contends that the complained-of discovery contained information that the Defendant had continuous access to, including her State of Delaware email and State of Delaware OAOA network.[59] The State asserts that the Defendant did not suffer any prejudice because she was offered, on multiple occasions, extended time to search the discovery production but declined because she wanted the trial to occur quickly.[60]

A *Brady* violation occurs where there is a "suppression by the prosecution of evidence favorable to an accused…[that] violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[61] In order for the State to discharge its responsibility under *Brady*, the prosecutor must disclose all relevant information obtained by the police

---

[57] *Id*. at ¶21.
[58] State's Resp. at 12, 14.
[59] *Id*. at 15.
[60] *Id*. at 15.
[61] *Wright v. State*, 91 A.3d 972, 987 (Del. May 19, 2014)(quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)).

20

or others in the prosecutor's office to the defense.[62]  That entails a duty on the part of the individual prosecutor "to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police."[63]

The Delaware Supreme Court explained that defendants are "not entitled to a perfect trial, but…are entitled to a fair one where material exculpatory and impeachment evidence is disclosed and not suppressed."[64]  A *Brady* violation occurs where the State fails to disclose material evidence that is favorable to the accused, because it is either exculpatory or impeaching, causing prejudice to the defendant.[65]  Exculpatory evidence is any evidence that is "material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution."[66]

When you cut through the *Brady* shouting that has occurred nearly every time the defense received documents from the State, the Defendant's real complaint here is that she was not given sufficient time to review large volumes of material provided to her months before the trial.  First, it is important to note that the documents here are ones that were contained on the Defendant's laptops in her office.  The Court agrees and has indicated in previous opinions that the State should have cloned the material from the computer and either returned the copies or the computer itself to

---

[62] *Wright*, 91 A.3d at 987.
[63] *Id*. (quoting *Kyles v. Whitley*, 514 U.S. 419, 437 (1995)).
[64] *Id*. at 977.
[65] *Id*.
[66] *Id*. at 989.

the defense. This would have allowed all parties to have timely access to its contents and to search the material for relevant documents well before trial. Unfortunately, that did not occur here.

Consequently, while unsatisfactory to the defense, the Court did limit the use in the State's case of documents that were produced after March 31, 2022. It also has on numerous occasions given the Defendant the option to delay the trial until the fall of 2022 to allow for a more thorough review of the documents provided. The Court appreciates that other "election" factors were in play, but the decision to move forward was at the insistence of the defense and not the Court. In addition, due to the decision to reindict the case in Kent County and to hold the trial in that forum, there was an additional delay of several weeks before the trial began.

*Brady* requires disclosure but not a "hand-me-on-a-plate" roadmap to all documents. There is no suggestion by the defense that they did not have the documents that were in the possession of the State. The complaint is that they did not have them timely or in the documents they did receive, the State had not diligently searched for exculpatory information. Certainly, if the State discovered exculpatory documents, it is required to produce them to the defense. However, the Court finds that the State has no obligation to look through hundreds of thousands of documents, one by one, and decide if a *Brady* disclosure obligation is warranted as to that document.

For a routine robbery or drug case, it generally is not unreasonable to require the State to thoroughly review documents and statements to comply with its *Brady* obligation. However, in a complex white-collar criminal matter that often involves hundreds of thousands of documents, such a standard is simply unrealistic, unmanageable and will lead to endless claims of *Brady* violations as has occurred here.

In addition, there is no claim that the State has intentionally withheld documents or that it has produced a significant volume of documents simply to overwhelm the defense and to hide documents from their discovery. In fact, it appears the opposite has occurred. To satisfy the Defendant's constant claims of a *Brady* violation, the State simply produced the discovery documents they had in their possession and did so in a searchable format. Despite the defense's contrary claim, they clearly were able to review the documents by using appropriate search terms and used many of those documents during trial.

A *Brady* violation requires that the Court find that documents meeting the *Brady* criteria have been suppressed by the State. That has not occurred here. While the State could have searched and interviewed other casual/seasonal employees or used different search terms when retrieving documents, the Court does not find that the State was required to do so. Such conduct may reflect a sloppy investigation by inexperienced investigators, but not a *Brady* violation. Several months before trial,

the defendant was provided the documents she now claims may have some exculpatory material therein but never asked for more time to review or search what had been produced. To complain now that she did not have sufficient time to review and prepare for trial is simply unreasonable.

The Court also wants to be clear that it is not suggesting that simply because the defense had the same documents as the State, it had a "due diligence" obligation to search those documents. Nor would it excuse the State from providing documents it discovers which are exculpatory. The State may not "hide" exculpatory documents and then argue the non-disclosure excuse because the Defendant had access to the file containing the document.

In this case, a large volume of documents was seized from the Defendant's computers. With today's modern technology, the days of going through each document one-by-one has passed and now logical search terms are used to discover relevant documents. In a half-a-million documents production, there may be some exculpatory documents that no one will find as they did not use the correct search term to gain access. That is not a *Brady* violation, as the State is unaware that the document even exists. Some degree of commonsense is required under these circumstances, and the failure to find documents alone cannot be a *Brady* violation as it is impossible to suppress unknown information. And suppression of evidence by the State is what the *Brady* rule was created to avoid.

What the Court finds particularly disturbing in the *Brady* assertions found in the Defendant's Motion for a New Trial is that the defense has discovered several additional casual/seasonal employees who were also allowed to continue to work for payment while attending college. Certainly, the Defendant would have appreciated that the unique attending college/working situation would call into question the benefits provided to Daughter that other similarly situated individuals had not been provided. Since it appears these individuals were unknown to the State and thus not interviewed, this unique information as to these two other individuals is something the defense and not the State would be aware of and either counsel was not discussing this issue with his client, the client was not being candid with counsel or perhaps the Defendant amazingly had a total lack of awareness of the importance of this issue.

While certainly significant information, the Court's assessment of a new trial request must rely on the evidence presented during the trial and not post-trial affidavits. It appears only the Defendant was in possession of this critical information and there is nothing to suggest the State was aware of the situation or suppressed that evidence. What is even more remarkable is it appears these two casual/seasonal employees were allowed to work from college in 2021, almost a year after the Defendant's daughter was given that same benefit. The Court can only assume that since the Defendant allowed this conduct by Daughter, she felt it was

appropriate to approve the request for these two other individuals. Unfortunately for the Defendant, consistent bad judgment does not make it right.

Finally, the defense argues that it was error to prevent the Defendant from obtaining internal prosecution work product and discussions when it was discovered that prosecutorial decisions had been made by a team of investigators and attorneys in the Attorney General's Office. When it was disclosed to the defense that, besides the lead prosecutor in the case, the Chief Deputy Attorney General was also involved in assisting with the investigation, the Defendant sought information about his involvement. While the argument and discussions in this area have been sealed, the Court will simply indicate that the areas defense counsel wanted to explore were beyond the preparation of the search warrant and would have spun the case into an unsubstantiated assertion of political espionage.[67] It was clearly not relevant to the indicted charges and duplication of the investigator's testimony at best.

The Court finds the Defendant was provided a fair trial, one that she was given significant latitude to explore all aspects of the investigation and prosecution, and no *Brady* violation occurred in this matter.

---

[67] The Court notes that the Defendant advised the Court during the trial that she was not pursuing a claim for selective prosecution, nor did she assert an allegation of vindictive prosecution.

26

## b. Count Five Evidence

The Defendant next argues that inadmissible character evidence regarding the act of intimidation charge was erroneously admitted by the Court and compromised the Defendant's trial.[68]  In sum, Defendant asserts that any testimony regarding Count Five that concerned events before June of 2021, when the Defendant allegedly was aware she was under investigation, is irrelevant and prejudicial.[69]  Defendant argues that the Court failed to apply the *Getz* test and the *DeShields* factors which weigh the probative value of the evidence and its prejudicial effects.[70]  Defendant contends that this evidence repeated uncharged misconduct evidence that tainted the jury's consideration of all of the charged counts.[71]

The State argues that the not guilty verdict on the act of intimidation charge suggests that the jury was able to parse through the evidence objectively and consistently with the jury instructions and that Defendant's "prejudicial spillover" argument is speculative and unsupported by the record.[72]

The Act of Intimidation charge in Count Five required a showing that (1) the Defendant's conduct was intended to prevent a witness from attending or giving testimony at any proceeding or inquiry authorized by law; (2) the person to whom

---

[68] Def.'s Mot. at ¶¶57-59.
[69] *Id*. at ¶76.
[70] *Id*. at ¶79-80.
[71] *Id*. at ¶¶84-88.
[72] State's Resp. at 16-17.

the Defendant's conduct is directed was a witness; (3) the Defendant acted knowingly, that is, the Defendant was aware that the person was a witness and aware that her conduct was intended to prevent or dissuade that person from attending or giving testimony at any proceeding or other inquiry authorized by law; and (4) the Defendant acted with malice.[73]

On May 2, 2022, the Court found that Count Five could not be dismissed because it was adequately pled in the indictment and articulated that the State must also prove that the Defendant was aware of the "trial, proceeding or inquiry."[74] Therefore, any evidence that tended to show the Defendant's awareness of a "trial, proceeding, or inquiry" was relevant to the determination of Count Five.[75]

First, the Court finds that the evidence the Defendant now claims was improper character evidence was relevant and admissible as to the Act of Intimidation charge set forth in Count Five. From the beginning of the case, the State has asserted the Defendant was aware she was under investigation well before the execution of the search warrant. Therefore, it was clearly appropriate and fair to allow the State to introduce evidence that would support this assertion. As such, evidence regarding the interaction of employees with the Defendant and her conduct

---

[73] Jury Instructions at 18-19; Trial Tr. June 30, 2022, at 122-24.
[74] *State v. McGuiness*, 2022 WL 1489572, at *3 (May 2, 2022).
[75] Del. R. of Evid. 401 ("Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

toward them was relevant as to whether they were acts of intimidation intended to prevent their cooperation with the State investigation. While the jury ultimately rejected the State's position and found the Defendant not guilty of this offense, it does not convert direct evidence of potential intimidation into improper evidence. If the Defendant had such a concern, she could have requested the Court to sever and try this matter separately at a later date. The Defendant did not do so and cannot now complain this evidence somehow has tainted the jury's verdict and view of the Defendant.

Further, simply because the Defendant asserts that she first learned of the investigation in June of 2021 does not mean it is true. The State was allowed to present evidence during its case of acts that would reasonably reflect a concern by the Defendant that her conduct was under investigation or at least a concern that her disgruntled employees were complaining of her conduct.

Interestingly, the counts that the jury did find the Defendant guilty of had no relationship to the interaction of the Defendant with the witnesses that testified regarding the intimidation count. Clearly the jury was able to compartmentalize each offense and the verdict suggests no prejudicial spillover occurred.

The Court also finds the Defendant's argument that the Court erroneously failed to conduct a *Getz* analysis regarding the testimony of these witnesses to be unpersuasive. The evidence was not introduced to suggest or infer that the

Defendant was a bad character but again was evidence directly relevant to the intimidation charge. Under such a circumstance a *Getz* analysis would have been inappropriate.

In spite of defense counsel's long dissertation concerning errors that the Court may have committed regarding this evidence, the Court simply finds it unpersuasive and will not grant a new trial as a result.

### c. Theories of Structuring

As the Court has granted the Defendant's Motion for Judgment of Acquittal as to Count Three, the Court finds the issues raised in this portion of the Motion for New Trial to be moot.

### d. Court's Comment

Next, Defendant asserts that the Court unconstitutionally commented on the credibility of a witness in the purview of the jury.[76] The Defendant argues that the Court improperly conveyed to the jury the Court's view that false statements made for the purposes of an "investigation technique" were not "false" statements.[77]

The State argues that the Court did not make an "unconstitutional" comment that prejudiced the Defendant but rather prevented Defendant from pursuing a

---

[76] Def.'s Mot. for a New Trial, at ¶¶115-116.
[77] *Id*. at ¶118.

fruitless argument on a minor, commonly understood investigative technique that was not coercive and did not affect the voluntariness of the witness's statement.[78]

After defense counsel pressed the Chief Investigating Officer to confirm that he "lied" while interviewing witnesses during the McGuiness investigation, upon the State's objection, the Court ruled that:

> If you want to pursue this, we all know what this is. It's an investigative technique used by the officer. You want to ask him that, that's fine. But to imply that because this is false, he is lying. That's simply unfair, Mr. Wood. So you can ask him about investigation techniques if you'd like. But to imply it otherwise is not acceptable.[79]

The Court then instructed defense counsel to move on in his line of questioning.[80]

"A trial judge has discretion to exercise reasonable control over the mode and order of the interrogation of witnesses and presenting evidence so as to: (1) make those procedures effective for determining the truth, (2) avoid wasting time; and (3) protect witnesses from harassment or undue embarrassment."[81] The Court's comment did not undermine the defense's theory of unfair investigation nor the questioning of the officer's tactics, but simply put a stop to a line of questioning that

---

[78] State's Resp. at 18.
[79] Trial Tr. June 29, 2022 A.M., Case No. 2206000799, at 88.
[80] *Id*. at 89.
[81] *Jones v. State*, 940 A.2d 1, 16 (Del. 2007); D.R.E. 611(a).

was belabored and the subject of previous cross-examination of the witness by defense counsel.

While it is not uncommon for a defendant to attempt to blame others when the outcome of the trial was not as they hoped, the weeks of pounding the idea of a flawed investigation was so overwhelming and so pronounced it lost its effectiveness. Reasonable questions regarding the manner in which the investigation was conducted are fair. But, to consistently call the investigator a liar and to attempt to mislead the jury as to his conduct, not only once but multiple times, and to now suggest the Court's comment would have affected the jury's decision is nearly laughable.

The Court is not simply a referee to make calls when requested but has an obligation and duty to ensure the trial is conducted fairly. The Court in this trial exercised extreme patience with counsel and provided defense counsel overwhelming latitude to make his point that this was a sloppy and ineffective investigation. However, to imply the investigator was intentionally lying when the failure to be candid with a witness was an investigative technique routinely utilized in criminal matters crossed the line. A fair trial required the Court to moderate this conduct and it had no effect on the jury's decision.

Even if the comment was found to be improper, the Court's jury instructions allay any potential prejudice caused.[82] The Court provided clear instructions for the jurors, advising that:

> You must determine whether the Defendant is guilty or not guilty solely from the evidence presented during the trial. If your recollection of that evidence disagrees with anything said, either by counsel [or by the Court], you should be guided entirely by your own recollection. It is your decision, and only your decision, to determine the true facts and any inferences from the proven facts.[83]

The Court further instructed:

> You are the sole judges of the credibility of each witness. You decide the weight to be given to each witness's testimony. You should consider each witness's means of knowledge, strength of memory and opportunity for observation, the reasonableness or unreasonableness of the testimony, the consistency or inconsistency of the testimony, the motivations of the witness, whether the testimony has been contradicted, the bias, prejudice or interest of the witness, if any, the manner or demeanor of the witness upon the witness stand, and all other facts and circumstances shown by the evidence that affect the credibility of testimony.[84]

These instructions were sufficient to cure any potential bias or prejudice inadvertently presented through the Court's comment.

### e. Multiplicity

Next, Defendant moves for a new trial based on multiplicity in violation of the Double Jeopardy Clause for Counts One, Three, and Four for the same reasons

---

[82] *Logue v. Dore*, 103 F.3d 1040, 1046-7 (1st Cir. 1997).
[83] Trial Tr. June 30, 2022, at 113; Jury Instructions at p. 3.
[84] Trial Tr. June 30, 2022, at 127-28; Jury Instruction at p. 25.

asserted in her Motion for Judgment of Acquittal.[85]  The State contends that the official misconduct charge does not implicate multiplicity because a conviction required the jury to find elements that were not contained in either Counts One or Three, and thus, an entirely separate charge.[86]

The Double Jeopardy Clause of the United States Constitution states that no "person [shall] be subject for the same offense to be twice put in jeopardy of life or limb."[87]  The Delaware State Constitution similarly mirrors that clause in Article I, Section 8.[88]  The Constitutional protection against Double Jeopardy is intended to protect a defendant from successive prosecutions for the same crime, from multiple charges under separate statutes requiring proof of the same factual events, and from multiple charges under the same statute.[89]

Defendant's multiplicity argument concerns the second multiplicity configuration—protection against multiple charges under separate statutes.[90]  To determine whether there is a violation, the Court will consider the *Blockburger* test. In *Blockburger*, the United States Supreme Court articulated the same-elements test to determine whether double jeopardy has been offended when a person is charged

---

[85] Def.'s Mot. for a New Trial, at ¶122-123.
[86] State's Resp. at 11.
[87] U.S. Const. amend. V.
[88] Del. Const. art. I, § 8.
[89] *Spencer v. State*, 868 A.2d 821, 822-23 (Del. Mar. 1, 2005).
[90] *Williams v. State*, 796 A.2d 1281, 1285 (Del. 2002).

with violating two statutes as a result of one act.[91]  "[T]he question is whether, both sections being violated by the same act, the accused committed two offenses or only one" and the standard is "whether each [statutory] provision requires proof of a fact which the other does not."[92]

In this case, Counts One, Three, and Four require the finding of different elements and therefore do not offend *Blockburger* or the Defendant's protection against Double Jeopardy.  The conflict of interest charge focuses on the Defendant's review of a matter before the State in which she had a personal or private interest. As explained, that count focused on the hiring of Daughter and the special benefits received by Daughter while employed at the OAOA, such as the ability to work while away at college.  And the procurement code violation charge focused on the Defendant's tactical accounting procedures in connection with the MyCG contract.

Whereas the official misconduct charge focuses on the Defendant's own benefit that resulted from her official acts that were not justified under the circumstances.  Specifically, the benefit received by the Defendant was the personal promotion from Daughter's social media posts or the work with MyCG aimed at raising the profile of the office and Defendant.[93]  Since Counts One, Three, and Four

---

[91] *Blockburger v. U.S.*, 284 U.S. 299, 304 (1932).
[92] *Id.*
[93] Trial Tr. June 22, 2022, Case No. 2206000799, at 30, 159-161.

require the proof of different facts, multiplicity is not an issue and is not a basis that warrants a new trial.

### f. Cumulative Error

Finally, Defendant contends that all grounds asserted individually may serve as a basis for a new trial, but the cumulative effect of all of these errors "cinches the matter."[94]  Defendant argues that only a new trial can cure the multiple errors during the course of this prosecution and trial, resulting in a fundamentally unfair proceeding.[95]  The State asserts that there was no cumulative error and that Defendant received a fair trial that included many evidentiary decisions in her favor.[96]

Cumulative error must derive from multiple errors that caused actual prejudice.[97]  Here, none of the arguments raised by the Defendant were errors that caused prejudice, as found above.  For that reason and the reasons state above in this Opinion, the Defendant has failed to establish any cumulative error.

---

[94] Def.'s Mot. for a New Trial, at ¶124.
[95] *Id*. at ¶126.
[96] State's Resp. at 18.
[97] *Michaels v. State*, 970 A.2d 223, 222 (Del. Mar. 17, 2009).

### III. Conclusion

For the foregoing reasons, the Defendant's Motion for Judgment of Acquittal is **DENIED in part and GRANTED in part** and Defendant's Motion for a New Trial is **DENIED**.

**IT IS SO ORDERED.**

/s/ William C. Carpenter, Jr.
Judge William C. Carpenter, Jr.