IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DEAN SUTTON, | § | |
| | § | |
| Defendant Below, | § | No. 333, 2023 |
| Appellant, | § | |
| | § | Court Below—Superior Court |
| v. | § | of the State of Delaware |
| | § | |
| STATE OF DELAWARE, | § | Cr. ID No. N2104001561 |
| | § | |
| Appellee. | § | |

Submitted: May 1, 2024
Decided: June 20, 2024

Before **VALIHURA**, **TRAYNOR**, and **LEGROW**, Justices.

## ORDER

After consideration of the brief and motion to withdraw filed by the appellant's counsel under Supreme Court Rule 26(c), the State's response, and the Superior Court record, it appears to the Court that:

(1) On August 31, 2021, a grand jury indicted Dean Sutton for first-degree murder, attempted first-degree murder, and two counts of possession of a firearm during the commission of a felony ("PFDCF"). The charges arose from an incident in which Sutton shot and killed Larry Porter and shot at Porter's son, Breon Harmon. During the four-day jury trial, Sutton admitted that he fired the gun but contended that his use of force was justified. On the evening of April 2, 2021, Porter and Harmon arrived at the Sutton family residence at 222 West 19th Street in

Wilmington to confront Sutton's cousin, Shaun Irby, about domestic issues between Irby and his wife. Irby's wife was Porter's niece, and Irby was staying at the Sutton residence at the time. Sutton was leaving the house when Porter, whom Sutton did not know, asked whether Irby was at home.[1] Sutton went into the house to call for Irby, and then Irby and Sutton walked outside together.[2] As they exited the house, Sutton saw Harmon, whom he also did not know, getting out of a car wearing a black ski mask, which raised "red flags" for Sutton.[3]

(2) Porter and Irby engaged in a heated conversation as Sutton and Harmon stood nearby.[4] Porter was "really angry," irate, loud, and yelling, and Sutton asked the others to leave and "take it somewhere else."[5] The verbal confrontation turned physical when Porter "swung on" Irby.[6] Porter got the upper hand in the fight; Porter grabbed Irby, pulled him down off the steps, punched him, and knocked him out.[7] As Porter continued to punch Irby as Irby lay on the ground, Sutton tried to push

---

[1] Appendix to Opening Brief at A460.

[2] *Id.* at A461-62.

[3] *Id.* at A462, A479-81. Harmon testified that he was wearing a black hat, not a ski mask. *Id.* at A374-75. When asked whether Harmon was wearing a hat or mask, Irby testified that Harmon might have been wearing a hoodie but that he did not really remember. *Id.* at A363. Harmon did not appear to be wearing a mask in surveillance videos that captured some of the events of the night at issue.

[4] *Id.* at A369-72, A464-66, A358-59.

[5] *Id.* at A463, A465, A385.

[6] *Id.* at A372, A466; *see also id.* at A384 (Harmon testimony agreeing that Porter "took the first swing on Mr. Irby").

[7] *Id.* at A466-67.

2

Porter away.[8]  Harmon then intervened, and Sutton and Harmon began tussling near the cars parked in the street, as Porter continued to assault Irby.[9]  A neighbor attempted to break up the fight between Sutton and Harmon, spraying them with mace, but they continued fighting.[10]

(3)     Sutton had a permit to carry a concealed weapon, and he had a gun that night.[11]  As Harmon restrained Sutton against a car in a headlock, Porter left Irby lying on the sidewalk and joined Harmon in the fight with Sutton.[12]  Sutton testified that he believed that Porter realized that Sutton was armed and might be able to grab the gun and use it against Sutton.[13]  He testified that he "feared for [his] life" because he had "two guys jumping on [him]," he had "just seen what he did to my cousin, beating him unconscious and continue beating him.  My life was—my life was in danger ultimately.  And he had access to my weapon and what else can I do?  No other option but to defend myself."[14]  Sutton took out the gun and fired at Harmon and then at Porter.[15]  Harmon felt the first shot go past his beard and started running

---

[8] *Id.* at A467-68, A372-73.
[9] *Id.* at A467-68, A372-73, A383-84.
[10] *Id.* at A372, A375, A378, A468, A490-92.
[11] *Id.* at A470-72, A313.
[12] *Id.* at A372-74, A468-72, A475.
[13] *Id.*at A472-73.
[14] *Id.* at A474.
[15] *Id.* at A471-74.

away.[16]  Porter said "stop, stop, stop."[17]  Sutton fired one more shot in Harmon's direction as he fled, and then turned toward Porter and fired three more shots.[18] Three bullets struck Porter; he died from his injuries.  Sutton then walked around the area, retrieving some of his possessions that had fallen to the ground, before getting into his car and driving away.[19]

(4)     Police officers arrived on the scene in response to a "shot spotter" alert. They found Irby injured[20] and Porter shot at the scene.  They collected evidence, including ballistics evidence and several videos from surveillance cameras in the area, including a neighbor's front-porch Ring camera.  The video evidence showed the men talking before the physical altercation began, Porter assaulting Irby while Irby was on the ground, Sutton and Harmon struggling between the cars, Sutton firing the gun, Porter saying "stop," and Harmon running down the street after the shooting.

(5)     Over the defense's objection, the court instructed the jury on the lesser-included offenses of second-degree murder and manslaughter as to the first-degree

---

[16] *Id.* at A374-76, A481.

[17] Sutton acknowledged that Porter told him to stop, though he denied having heard it at the time because "adrenalin [was] rushing."  *Id.* at A494-95; *see also id.* at A376 (Harmon testimony that he heard Porter say "stop" after Sutton fired the first shot).

[18] *Id.* at A482, A497.

[19] *Id.* at A497-98, A500-01.

[20] Irby was transported to the hospital and woke up there the following day; he sustained a concussion, several lacerations, and several broken bones in his face and around his eye.  *Id.* at A361-62.

4

murder charge and the lesser-included offense of first-degree reckless endangering as to the attempted first-degree murder charge. The jury found Sutton guilty of the lesser-included offenses of manslaughter and first-degree reckless endangering and acquitted him of the PFDCF charges. On September 1, 2023, the Superior Court sentenced Sutton to a total of thirty years of imprisonment, suspended after ten years for decreasing levels of supervision.

(6) In this direct appeal, Sutton's counsel has filed a brief and a motion to withdraw under Supreme Court Rule 26(c). Sutton's counsel asserts that, based upon a conscientious review of the record, there are no arguably appealable issues. Counsel informed Sutton of the provisions of Rule 26(c) and provided him with a copy of the motion to withdraw and the accompanying brief. Counsel also informed Sutton of his right to supplement counsel's presentation. Sutton responded with points he wanted to present for the Court's consideration, which counsel included with the Rule 26(c) brief. The State has responded to the Rule 26(c) brief and argues that the Superior Court's judgment should be affirmed.

(7) When reviewing a motion to withdraw and an accompanying brief under Rule 26(c), this Court must be satisfied that the appellant's counsel has made a conscientious examination of the record and the law for arguable claims.[21] This

---

[21] *Penson v. Ohio*, 488 U.S. 75, 83 (1988); *McCoy v. Court of Appeals of Wisconsin*, 486 U.S. 429, 442 (1988); *Anders v. California*, 386 U.S. 738, 744 (1967).

5

Court must also conduct its own review of the record and determine whether "the appeal is indeed so frivolous that it may be decided without an adversary presentation."[22]

(8) Sutton's first argument is that his use of force was justified. Sutton asserts that he was permitted to use the force that he believed was necessary to protect himself from unlawful force or to protect Irby from death or serious bodily harm.[23] He also contends that he was not obligated to retreat from his dwelling before using force in self-protection.[24] Because the Superior Court provided the jury with a self-defense instruction, including as to the law governing retreat, we construe Sutton's argument to be that the Superior Court should have instructed the jury regarding the use of force for the protection of other persons, as provided in 11 *Del. C.* § 465.

---

[22] *Penson*, 488 U.S. at 82.

[23] *Cf.* 11 *Del. C.* § 464(a) ("The use of force upon or toward another person is justifiable when the defendant reasonably believes that such force is immediately necessary for the purpose of protecting the defendant against the use of unlawful force by the other person on the present occasion."); *id.* § 464(c) ("The use of deadly force is justifiable under this section if the defendant reasonably believes that such force is necessary to protect the defendant against death, serious physical injury, kidnapping or sexual intercourse compelled by force or threat."); *id.* § 465 (establishing the circumstances under which the use of force to protect a third person is justifiable).

[24] *Cf. id.* § 464(e)(2)a (providing that the use of deadly force in self-defense is not justifiable if the defendant "knows that the necessity of using deadly force can be avoided with complete safety by retreating," except that the defendant "is not obliged to retreat in or from the defendant's dwelling"); *id.* § 465(b)-(d) (governing when retreat is required before using force for the protection of a third person).

(9)     Sutton requested a self-defense instruction but did not ask the Superior Court to provide an instruction as to the use of force for the protection of another person; we therefore review for plain error.[25]  "Under the plain error standard of review, the error complained of must be so clearly prejudicial to substantial rights as to jeopardize the fairness and integrity of the trial process."[26]  By the time Sutton fired the gun, Porter had left Irby lying on the sidewalk and joined with Harmon in fighting with Sutton.  Moreover, Sutton testified that he believed that it was necessary to use the gun after Porter punched Sutton's side, may have realized that Sutton had a gun, and tried to reach for it.  Thus, the more immediate threat by the time of the shooting was to Sutton, not Irby, yet the jury declined to find that Sutton's conduct was justified as self-defense.[27]  On the facts of this case, we conclude that

---

[25] *See Canty v. State*, 394 A.2d 215, 217 (Del. 1978) ("A request for instruction on defense of others was not made before the charge was given, nor was an objection made thereafter.  The Trial Judge's failure to instruct [s]ua sponte on that concept was not plain nor reversible error . . . ."); *see also Rivera v. State*, 2023 WL 1978878, at *8 (Del. Feb. 13, 2023) ("Rivera did not request a jury instruction on self-defense . . ., so we review for plain error."); *Probst v. State*, 547 A.2d 114, 119 (Del. 1988) (reviewing for plain error because defendant did not object "at trial to any of the jury instructions on the grounds that are currently before us").

[26] *Wainwright v. State*, 504 A.2d 1096, 1100 (Del. 1986).

[27] Consistent with 11 *Del. C.* § 470(a), the court instructed the jury that if it found that Sutton believed that the use of force upon Harmon and Porter was necessary to protect himself against death or serious physical injury, but he was reckless in having such belief, self-defense was unavailable.  *See* 11 *Del. C.* § 470(a) ("When the defendant reasonably believes that the use of force upon or toward the person of another is necessary for any of the purposes for which such relief would establish a justification under §§ 462-468 of this title but the defendant is reckless or negligent in having such belief . . ., the justification afforded by those sections is unavailable in a prosecution for an offense for which recklessness or negligence, as the case may be, suffices to establish culpability."); *Clark v. State*, 65 A.3d 571, 578 (Del. 2013) (holding that Section 470(a) provides that justification is unavailable for offenses that require a reckless mental state if the defendant's belief that force is justified is itself reckless).  The offenses of which Sutton was

7

the trial court did not plainly err by not *sua sponte* providing a defense-of-others instruction.

(10) Next, Sutton claims that the police officers' testimony at trial was inconsistent or contradictory in various respects, amounting to perjury and a violation of due process. For example, he asserts that one officer testified that Irby spoke to her when she arrived on scene and then later testified that they did not have a conversation; another officer said that he saw Porter on the ground but did not see Irby; Detective Mosley, the lead investigator, testified that he obtained an arrest warrant on April 5, 2021, and then later stated that he obtained it on April 2, 2021; and Detective Mosley testified that he could not locate Sutton between April 2 and 13, 2021. After careful consideration, we conclude that, to the extent that Sutton has identified inconsistencies or contradictions at all, they "were such as would usually be found in the trial of criminal cases"[28] and merely raised a credibility issue for the

---

convicted required a reckless mental state. *See* Appendix to Opening Brief at A623-24 (instructing jury that "a person is guilty of manslaughter when a person recklessly causes the death of another person" and that to find Sutton guilty of manslaughter "you must find that the State has proved the following two elements beyond a reasonable doubt: 1, the defendant caused the death of Larry Porter and; 2, in causing this death, the defendant acted recklessly"); *id.* at A630 (instructing jury that "a person is guilty of reckless endangering in the first degree when the person recklessly engages in conduct which creates a substantial risk of death to another person" and that "[i]n order to find the defendant guilty of reckless endangering in the first degree, you must find the State has proved the following two elements beyond a reasonable doubt: 1, the defendant engaged in conduct that created substantial risk of death to Breon Harmon. 2, the defendant acted recklessly").

[28] *Zutz v. State*, 160 A.2d 727, 729 (Del. 1960).

8

jury to resolve.[29]  Sutton has not demonstrated that the State knowingly used perjured testimony, and reversal is not warranted.[30]

(11)  Sutton also argues that Detective Mosley edited a video from the night of the shooting so that it did not show that Harmon was wearing a ski mask.  Sutton did not object to the introduction of the video at trial or argue that it had been edited as he now claims.  On appeal, Sutton has not substantiated his speculative assertion that the video was edited and would have shown Harmon wearing a ski mask.  We find no merit to this claim.[31]

(12)  Sutton asserts that there were certain text messages between Porter, Harmon, and Michelle Porter (Porter's wife and Harmon's mother), which the State

---

[29] *See Romeo v. State*, 2011 WL 1877845, at *3 (Del. May 13, 2011) ("[M]ere contradictions in a witness's testimony may not require reversal because those contradictions may not constitute knowing use of false or perjured testimony.  Rather, mere contradictions in trial testimony establish a credibility question for the jury." (citations omitted)); *see also Knight v. State*, 690 A.2d 929, 932 (Del. 1996) ("It is well-settled that the trier of fact is the sole judge of the credibility of the witnesses and responsible for resolving conflicts in the testimony." (internal quotation omitted)).

[30] *Jenkins v. State*, 305 A.2d 610, 616 (Del. 1973) ("There is nothing before us to indicate that the State knowingly used perjured testimony.  The fact that there were contradictions within Hall's testimony does not require reversal."); *see also Zutz*, 160 A.2d at 495-96 ("The rule is too well established that a verdict of a jury, based upon competent evidence, even though conflicting, will not be set aside upon appeal.  An appellate court does not weigh the testimony; to do so would usurp the function of the jury.  The only thing which an appellate court may do in such case is to determine if there was competent evidence upon which the verdict might reasonably be based.  If there was, as we believe to be the case here, the judgment of conviction must be affirmed." (citation omitted)).

[31] *Cf. Blackwood v. State*, 2023 WL 6629581, at *8-9 (Del. Oct. 11, 2023) (rejecting claim that "the prosecution presented to the jury an 'altered and manipulated' video" of defendant's interview with police, because defendant "has not provided any evidence that the State altered or manipulated the video, other than applying the approved redactions[, n]or does he assert that the State did not provide the defense with an unredacted copy of the video, such that the defense could have argued to the Superior Cour that the State had spliced the video, if that were true").

9

did not introduce into evidence, that would have shown that Porter and Harmon went to 222 West 19th Street on the night of the incident intending to fight Irby, not just talk to him. The record reflects that the State produced the contents of Harmon's cellphone extraction, which included the text messages, in discovery in September 2021. Thus, the defense could have introduced the messages if they would have been helpful to the defense. In any event, Harmon's and Sutton's testimony and the video evidence reflected that the interaction quickly turned physical and that Porter threw the first punch, and Sutton has not shown how the text messages would have changed the result of the trial.[32]

(13) Sutton contends that the prosecution misled the jury by playing a version of the neighbor's Ring-camera video that was edited to omit Porter's assault on Irby. The trial transcript reflects that the neighbor observed that the video played during his testimony was "cropped" and did not "show the whole video."[33] Sutton concedes that the prosecution later played the full video for the jury. During closing arguments defense counsel encouraged jurors to "[w]atch the uncropped version of the video in realtime."[34] We find no reversible error as to this issue.

---

[32] Sutton's claim that he was denied a fair trial because the State failed to disclose any evidence before trial is not supported by the record, which reflects that the State provided substantial discovery beginning in September 2021; the discovery included, among many other things, the surveillance videos, the crime-scene video, cell phone extractions, numerous police reports, medical records and the report of Porter's autopsy, warrants, a recording and transcript of Sutton's police interview, and a ballistics report.

[33] Appendix to Opening Brief at A313.

[34] *Id.* at A581.

(14)   Sutton also claims that he was denied his right to a speedy trial. To determine whether a speedy-trial violation occurred, we use the four-factor balancing test set forth in *Barker v. Wingo*.[35]  The four factors are the length of the delay, the reason for the delay, the defendant's assertion of the right, and the prejudice to the defendant.[36]  "The length of the delay is the trigger that necessitates the consideration of the other three *Barker* factors."[37]  "Unless the length of delay is determined to be 'presumptively prejudicial,' it is not necessary to consider the other *Barker* factors."[38]  "The right to a speedy trial attaches as soon as the defendant is accused of a crime through arrest or indictment, whichever occurs first."[39]  If the delay between arrest or indictment and trial approaches one year, then the Court will generally consider the additional factors.[40]

(15)   Sutton was arrested on April 13, 2021, and indicted on August 30, 2021. Thus, his speedy-trial right attached when he was arrested. More than two years passed between Sutton's arrest on April 13, 2021, and the beginning of jury selection

---

[35] 407 U.S. 514 (1972).  *See Johnson v. State*, 305 A.2d 622, 623 (Del. 1973) (adopting the *Barker* framework for evaluating speedy-trial claims).

[36] *Johnson*, 305 A.2d at 623 (citing *Barker*).

[37] *Dabney v. State*, 953 A.2d 159, 164 (Del. 2008).

[38] *McGriff v. State*, 2023 WL 600118, at *3 (Del. Jan. 27, 2023) (quoting *Middlebrook v. State*, 802 A.2d 268, 274 (Del. 2002)).

[39] *Middlebrook*, 802 A.2d at 273.

[40] *McGriff*, 2023 WL 600118, at *3.

on April 27, 2023, and we will therefore consider the additional *Barker* factors.[41]  As to the reason for the delay, it was attributable to the judicial emergency that was declared in response to the COVID-19 pandemic.  The speedy-trial guidelines were tolled during some of the period between Sutton's arrest and his trial.[42]  With the exception of a brief period in October and November 2020, jury trials were suspended between March 16, 2020, and June 1, 2021.[43]  Other proceedings, including grand jury proceedings, were also suspended during the initial periods of

---

[41] *Compare Rivera v. State*, 2023 WL 1978878, at *5 (Del. Feb. 13, 2023) (considering the additional *Barker* factors "because there is more than one year between Rivera's arrest (June 11, 2019) and the start of his trial (August 10, 2021)," and concluding that although approximately eight weeks of delay were attributable to the State, "most of the trial delay" was the result of the COVID-19 judicial emergency), *with McGriff*, 2023 WL 600118, at *3 ("More than one year passed between McGriff's arrest in May 2020 and trial in November 2021.  McGriff fails, however, to acknowledge the reason for this delay.  For a significant portion of the time between McGriff's arrest (May 19, 2020) and trial (November 16, 2021 to November 18, 2021), there was a judicial emergency in effect because of the COVID-19 pandemic.  With the exception of a brief period between October 5, 2020 and November 16, 2020, jury trials were suspended between March 2020 and June 1, 2021.  The Chief Justice's judicial emergency orders tolled the time requirements under the Speedy Trial Guidelines.  McGriff also fails to identify any prejudice that he suffered from the delay.  He has not shown that the delay caused any impairment to his defense.  There was no violation of McGriff's right to a speedy trial." (citations omitted), *and McGriff v. State*, 2023 WL 469122, at *2-3 (Del. Jan. 27, 2023) (similar discussion relating to different prosecution, in which defendant was arrested on April 22, 2020 and trial began on July 20, 2021).

[42] *See In re COVID-19 Precautionary Measures*, Administrative Order No. 22 Extension of Judicial Emergency, at 1-3 (Del. June 29, 2021), *available at* https://courts.delaware.gov/forms/download.aspx?id=157738 (reciting that a judicial emergency went into effect on March 16, 2020, was repeatedly extended, and would be lifted on July 13, 2021, and providing:  "Until the expiration of the judicial emergency on July 13, 2021, all time requirements under the Speedy Trial Guidelines are tolled. . . .  After the judicial emergency expires, the trial courts shall comply with those guidelines, as amended.").

[43] *McGriff*, 2023 WL 469122, at *2 & nn. 10-11 (citing administrative orders).

12

the judicial emergency.[44]  The suspensions created a backlog of proceedings to resolve as the courts moved toward resuming normal operations.  On June 29, 2021, in connection with the anticipated end of the judicial emergency on July 13, 2021, the Chief Justice authorized the Superior Court to prioritize cases in which the defendant was indicted between March 16, 2020, and December 31, 2021, "as [the Superior Court] determines to be in the best interests of justice and of allowing for the prompt and efficient management of the caseload resulting from the COVID-19 pandemic."[45]  Sutton was indicted on August 30, 2021.  On October 18, 2021, the Superior Court entered a scheduling order that provided for Sutton's jury selection to begin on April 27, 2023, and trial to begin on May 1, 2023.  Those dates stuck: jury selection began on April 27, 2023, and the jury was sworn and trial began on May 1, 2023.  The delay in this case was clearly attributable to the COVID-19 judicial emergency, and this factor therefore is neutral and does not weigh in Sutton's favor.[46]

---

[44] *See, e.g.*, *In re COVID-19 Precautionary Measures*, Administrative Order No. 13 Return to Phase 2 of the Reopening Plan (Del. Nov. 16, 2020) (providing for return to Phase 2 of courts' reopening plan and permitting grand jury proceedings during Phase 2).

[45] *In re COVID-19 Precautionary Measures*, Administrative Order No. 22 Extension of Judicial Emergency, *supra* note 42, Exhibit 1 ¶ (a)(iv).

[46] *See United States v. Small*, 2023 WL 4399212, at *4 (3d Cir. July 7, 2023) (describing the COVID-19 pandemic as a "neutral reason" for a delay that "weighs against neither party" in the *Barker* analysis, and citing cases from other federal courts of appeal); *see also United States v. Allen*, 86 F.4th 295, 305 (6th Cir. 2023) ("[F]rom July 2020 to August 2021, the district court delayed the trial because of the COVID-19 pandemic.  We and other courts have treated this type of delay as a valid reason that also weighs against the defendants (or at least as a neutral reason that favors neither party)."); *United States v. Pair*, 84 F.4th 577, 589 (4th Cir. 2023) (analyzing

13

(16)   As to the defendant's assertion of his right to a speedy trial, Sutton's counsel did not assert a speedy-trial violation, a fact that might be attributable to counsel's recognition that the Superior Court scheduled the matter within the authority afforded it in light of the judicial emergency.  Sutton did submit *pro se* correspondence to the court in which he mentioned the length of time that he had been incarcerated and his right to a speedy trial, although the correspondence focused largely on his claims that his use of force was justified.  The Superior Court forwarded the correspondence to counsel under Superior Court Rule of Criminal Procedure 47.  This factor is neutral in our analysis.

(17)   As to the fourth *Barker* factor, this court considers prejudice "in light of three of defendants' interests that the speedy trial right was designed to protect: (1) preventing oppressive pretrial incarceration; (2) minimizing the anxiety and concern of the accused; and (3) limiting the possibility that the defense will be impaired."[47]   "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system."[48] "Not only is impairment of a defendant's defense the most serious type of prejudice, but it is also the most difficult form of speedy trial prejudice to prove because time's

---

"presumptively prejudicial" delay of 401 days and determining that the judicial response to the COVID-19 pandemic was "a valid reason for delay" that "favor[ed] the government" under the second *Barker* factor).

[47] *Middlebrook*, 802 A.2d 268, 276 (Del. 2002).

[48] *Barker v. Wingo*, 407 U.S. 514, 532 (1972); *Middlebrook*, 802 A.2d at 277.

14

erosion of exculpatory evidence and testimony can rarely be shown."[49]  "[W]hether the delay has hurt the defense is not a point to be resolved with mathematical certainty."[50]  After careful consideration, we conclude that Sutton has not established that the delay in this case prejudiced his defense.  The fact that Sutton shot Porter was not disputed, and the witnesses' testimony regarding the incident was generally consistent—to the extent that there were material inconsistencies, they appear to be attributable to normal differences in witnesses' motivations or observations, rather than to faded memories.[51]  The issue in the case was whether Sutton was justified in shooting Porter, which turned on Sutton's state of mind and his belief about the threat posed by Porter and Harmon.  Sutton has not demonstrated how he was prejudiced by the delay.[52]  We conclude that the pandemic-related delay in this case did not violate Sutton's constitutional right to a speedy trial.

---

[49] *Middlebrook*, 802 A.2d at 277 (internal quotations omitted).

[50] *Id.* (internal quotations omitted).

[51] For example, Harmon testified that he was not wearing a ski mask on the night in question, and Sutton testified that Harmon was wearing a ski mask.  That difference in testimony is more likely explained by the differing motivations of those witnesses than by faded memories, and it presented a credibility question to be resolved by the jury.

[52] *Cf. United States v. Chu*, 99 F.4th 610, 615 (3d Cir. 2024) (holding that COVID-19-related delays did not violate defendant's constitutional right to a speedy trial, in case in which defendant was indicted in September 2019 and trial began March 1, 2022; stating that the defendant did not "provide evidence that the delay impaired her ability to prepare a defense, and only asserted claims of emotional distress," and that defendant's "desire to minimize the stress she felt from delays in her trial, while understandable, is simply not sufficient on its own to establish prejudice"); *United States v. Allen*, 86 F.4th 295, 306 (6th Cir. 2023) (holding that defendants were required to—and failed—to show actual prejudice from delays for which there were valid reasons, including pandemic-related delays); *United States v. Pair*, 84 F.4th 577, 590-91 (4th Cir. 2023) (acknowledging defendant's arguments concerning prejudice from pretrial incarceration and heightened anxiety from the delay, especially in light of high rates of COVID-19 among inmates,

(18)    Sutton also appears to challenge the Superior Court's decision to grant the State's request for lesser-included-offense instructions, over Sutton's objection. We review this claim *de novo*.[53]  A trial court should instruct the jury on a lesser-included offense if:   (1) a party makes a proper request; (2) the lesser-included offense contains some, but not all, of the elements of the charged offense; (3) the elements differentiating the two offenses are in dispute; and (4) there is some evidence that would allow a rational jury to acquit the defendant of the greater charge and convict him of the lesser charge.[54]

(19)    The State requested that the court instruct the jury on second-degree murder and manslaughter as lesser-included offenses of the first-degree murder charge and on first-degree reckless endangering as a lesser-included offense of attempted first-degree murder.  The offenses on which the court instructed the jury differed as to the intent element, which was in dispute.   The Superior Court determined that there was some evidence that would allow a rational jury to find that

---

but concluding that defendant had not demonstrated prejudice under *Barker* because he did not show that "any evidence was damaged or lost, that any witnesses could not be found, or that his case was harmed in any manner by the delay" (internal quotation omitted)).

[53] *Capano v. State*, 781 A.2d 556, 628 (Del. 2001).

[54] *Clark v. State*, 65 A.3d 571, 581-82 (Del. 2013); *see also State v. Cox*, 851 A.2d 1269 (Del. 2003) ("In criminal proceedings, a trial judge is required to instruct the jury on a lesser-included offense over the objection of an opposing party if:   it is requested by any party; there exists a rational basis in the evidence for the jury to convict the defendant of the lesser charge and acquit the defendant of the greater charge;  and prosecution for the lesser-included offense is not time barred.  In this case, the trial judge committed legal error by sustaining the defendant's objection and denying the State's request for a lesser-included offense instruction that was rationally supported by the evidence.").

16

Sutton acted without the requisite intent for first-degree murder or attempted first-degree murder but instead acted recklessly or with a cruel, wicked, and depraved indifference to human life.[55] We agree. Among the evidence from which a rational jury might have concluded that Sutton acted recklessly rather than intentionally was Sutton's testimony concerning the perceived threat; his testimony that he could barely see when he reached for the gun,[56] he could not hear because adrenaline was rushing,[57] he was "in shock,"[58] "in a panic,"[59] and "did not want to hurt them;"[60] and his statement to Detective Mosley that on the night of the incident he thought he might have shot Irby.[61] The Superior Court correctly concluded that lesser-included-offense instructions were warranted.

(20) Sutton also argues that, by convicting him of manslaughter and first-degree reckless endangering but acquitting him of the two PFDCF counts, the jury rendered inconsistent verdicts. Sutton did not present this argument to the Superior

---

[55] Appendix to Opening Brief at A530.

[56] *Id.* at A473.

[57] *Id.* at A494.

[58] *Id.* at A475.

[59] *Id.* at A500.

[60] *Id.* at A484.

[61] *Id.* at A492-93.

Court.[62]  To the extent the verdicts are inconsistent,[63] the Court may uphold the manslaughter and reckless endangering convictions under the rule of jury lenity because there was sufficient evidence to justify those convictions.[64]

(21)  Finally, Sutton inquires whether it was "legal for [Detective Mosley] to sit in on the entire trial as a state witness?"  Sutton did not ask the Superior Court to exclude Detective Mosley, the chief investigating officer, from the trial.  "This Court has ruled that the chief investigating officer for the prosecution in a criminal case is

---

[62] *See* DEL. SUPR. CT. R. 8 ("Only questions fairly presented to the trial court may be presented for review; provided, however, that when the interests of justice so require, the Court may consider and determine any question not so presented.").

[63] *See Tilden v. State*, 513 A.2d 1302, 1306 (Del. 1986) ("Inconsistent verdicts may take the form of acquittal of a predicate offense but conviction of a compound offense; or conviction of a lesser included offense which implicitly results in an acquittal of a more serious offense the aggravating element of which is required for the conviction of a related compound offense.").  The jury's verdict in this case does not fit either of the inconsistent-verdict scenarios described in *Tilden*. Sutton was convicted of offenses—manslaughter and first-degree reckless endangering—each of which was one of the three elements of the corresponding PFDCF count and acquitted of PFDCF. *See* Appendix to Opening Brief at A625-26 ("[T]o find the defendant guilty of possession of a firearm during the commission of a felony, you must find that each of the following three elements have been established beyond a reasonable doubt:  1, the defendant committed the felony, in this case attempted murder in the first degree, murder in the second degree or manslaughter. 2, the defendant possessed a firearm during the commission of a felony. 3, the defendant acted knowingly. . . .  Knowingly means that a defendant knew or was aware that the defendant was engaging in unlawful conduct."); *id.* at A631-32 ("[T]o find the defendant guilty of possession of a firearm during the commission of a felony, you must find that each of the following three elements has been established beyond a reasonable doubt. 1, the defendant committed a felony, in this case attempted murder in the first degree or reckless endangering in the first degree. 2., the defendant possessed a firearm during the commission of a felony. 3, the defendant acted knowingly.  The terms firearm and possession and knowingly have all previously been defined for you, so I'm not going to reread them.  They will be in your instructions.").  The jury might have determined that the State did not prove one of the other elements of PFDCF, such as the "knowingly" element.

[64] *Williams v. State*, 2020 WL 388431, at *3 (Del. Jan. 22, 2020).

18

exempted from sequestration" under Delaware Uniform Rule of Evidence 615(b).[65] "Thus, absent other reasons for sequestration, the chief investigating officer may not be excluded from the trial even if he is scheduled to testify."[66] We find no error as to this issue.

(22) We have reviewed the record carefully and conclude that Sutton's appeal is wholly without merit and devoid of any arguably appealable issue. We also are satisfied that Sutton's counsel has made a conscientious effort to examine the record and has properly determined that Sutton could not raise a meritorious claim in this appeal.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Superior Court be AFFIRMED. The motion to withdraw is moot.

BY THE COURT:

*/s/ Gary F. Traynor*
Justice

---

[65] *Taylor v. State*, 849 A.2d 405, 408 (Del. 2004). D.R.E. 615(b) provides that, although the court may order sequestration of witnesses, the rule does not authorize excluding "an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney."

[66] *Taylor*, 849 A.2d at 408.